November 6, 2006

Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: United States v. Paul Bedewi

Dear Judge Roberts:

I am writing you today to formally address you with regard to my upcoming sentencing scheduled for November 30, 2006. I understand that I will have the opportunity to address the Court at that time; however, I felt it was important for me to address you in this manner. I know that the hearing will be an emotional time for me and my family. I am concerned that the emotions and anxiety surrounding that day will preclude me from fully expressing my thoughts and concerns for everyone involved.

*Background*

I was recruited to the George Washington University (GWU) by my cousin, Dr. Nabih E. Bedewi, who was working with others at GWU to start a research center, the FHWA/NHTSA National Crash Analysis Center (NCAC), to study issues in transportation safety. My background in Biomechanics was well suited to studying how vehicle occupants could be injured or killed in car crashes. The esteemed position that my cousin held in our family played an important role in my decision to attend GWU.

I enrolled at GWU in the Fall of 1994 and was awarded a graduate fellowship, which included full tuition and stipend. My cousin became my academic advisor. I did my graduate research at the NCAC under the direction of Dr. Kennerly Digges, an internationally recognized expert in transportation safety research. I obtained the degree of Master of Science (M.S.) in August 1995 and my Doctor of Science (D.Sc.) degree in May 1998.

Upon completion of my D.Sc., I worked at the NCAC as a research scientist. In October 1998, Ford Motor Company hired me as a Technical Specialist in its Safety Research & Development Department in Dearborn, Michigan, where I concentrated on technologies and safety designs for all future automobiles. While at Ford, I maintained contact with my cousin and Dr. Digges.

In January 2002, both my cousin and Dr. Digges began recruiting me to return to GWU and the NCAC for employment. The NCAC was in the process of being awarded a large research grant to be directed by Dr. Digges, which came from Ford as a result of a legal settlement from a class action lawsuit. Dr. Digges wanted me to help him conduct and administer the day-to-day research activities under this grant, which involved $2.5 million in research at GWU and the oversight of $2.5 million of research at other colleges and universities.

I accepted a position at the NCAC as a Research Scientist beginning in May 2002, with an opportunity to work along side Dr. Digges and Dr. Nabih Bedewi. My first assignments involved assisting Dr. Digges in developing this research program, and deciding which

Exhibit 1
United States v. Bedewi
Cr. No. 05-303-01

institutions other than GWU would be recipients of grants under the funds that Dr. Digges would administer. Once the award arrived, I actively managed this research program for Dr. Digges and the NCAC. As NCAC Director, Dr. Nabih Bedewi oversaw this research as well.

In addition to my role at GWU, I performed unrelated consulting work for the Motor Vehicle Fire Research Institute (MVFRI). This was necessary to attempt to make up the difference in total compensation of salary and benefits between my positions at Ford and GWU. The MVFRI is a non-profit research organization headed by a Board of Directors (Dr. Digges, Joan Claybrook, Clarence Ditlow, & R. Rhodes Stephenson), established out of a legal settlement from a lawsuit involving General Motors, to administer research involving fire safety. My consulting work for MVFRI began in February 2002.

## My Conduct

My offenses arose out of my wholehearted (though retrospectively extremely misguided) acceptance of the idea that my cousin instilled in the people who worked at the NCAC: Because my colleagues and I were working hard and producing substantial high-quality work, we were entitled to bend the rules in order to give ourselves "rewards". These self-declared benefits included meals at expensive restaurants (often disguised as "staff meetings"); first-class travel; golf club membership, etc. We would pay for these items using the credit card, known as a "P-Card," that each of us had been given by GWU. In my case, these charges were covered for the most part from funds provided by grants from several research sponsors that funded my salary, specifically the grant from Ford. GWU and the sponsors were unaware of this practice. In addition, I allowed my cousin to authorize a student stipend for my non-student wife. I do not intend this as an excuse or justification, since I am clearly smart enough to have known better. I genuinely believe that the rationalizing that I engaged in was made easier because of my relationship with my cousin, who had a similar impact on NCAC employees without the same personal relationship. I had not engaged in any dishonesty up to that point in my life; unfortunately, it became too easy just to put the charges on the credit card, particularly with my cousin as the principal reviewing authority for my expense reports. In this way, the use of the research grant money, which was substantial, had an unreal feeling to it as we were not called upon to justify these expenditures until the second half of 2004. I held on to this sense of entitlement until I was made to look at the real nature of what I did. Although it has often been painful for me to face what I have done and admit that what I did was wrong, the impact of this process has been a powerful one. Before discussing that, I will first describe in greater detail the things I did.

## Fraudulent Stipend Payment

Upon returning to the NCAC after my years at Ford, I took a significant cut in salary and benefits. Although the consulting work for the MVFRI supplemented my income from GWU, I wanted to maintain a lifestyle that was equivalent to the one we had in Detroit during my employment at Ford. In August of 2002, I told my cousin (Nabih) that I was having difficulty meeting my financial obligations, specifically the higher mortgage payment I experienced in the D.C. area and unexpected increases in living expenses.

I asked him if there were any ways in which I could supplement my income. I suggested paying my wife to perform administrative tasks for me. He agreed and initiated the payment of a stipend to my wife. He told me that he could give her a graduate student stipend and that this would avoid questions from GWU officials. He also said that I would have to find some work

for her to do, but that I could decide what that would be. My wife received $1500 per month for 24 months.

Although my wife performed several tasks at my request during the time period that she was receiving the stipend, the limited work was done from our home and solely under my supervision. At no time was her work reviewed, monitored, or administered by anyone from GWU, and she never conducted this work at the NCAC facilities. Although I can point to work-product as a result of her effort, I feel confident that, given the nature of the tasks, she would have done this work as a favor to me whether she was paid or not. But whether or not she performed compensable work is beside the point with regard to the propriety of the stipend. The arrangement was improper in its conception because she was not a graduate student. My accepting the shortcut that my cousin offered is a manifestation of my willingness at that time to rationalize and minimize the clearly improper nature of this decision.

### Fraudulent Use of Procurement Card

In August 2002, I received a University Procurement Card ("P-Card") in order to charge various expenses associated with the research grants I was working on. These expenses included research supplies and equipment, travel, and other expenses consistent with the terms of the research grants/contracts and designed to accomplish the goals of the specific grant.

I used the card improperly. Again, my conduct stemmed from my willingness to indulge in the arrogant misconception that long hours and excellent work product entitled me and my colleagues to give ourselves a variety of "rewards": "staff meetings" at expensive restaurants; travel to expensive places; golf course membership (which I rationalized as a means to entertain potential grantors). This last item was the largest single expense (more than $30,000). The expense reports claimed that this money was spent on meetings held at the golf club where I obtained membership at Nabih's suggestion. I was protected by the fact that my cousin or Dr. Azim Eskandarian reviewed these expenses and allocated them to the research grants/contracts on which we were working.

### The Victims

There were several victims of my actions. First and foremost were the research sponsors, This includes Ford Motor Company, Plaintiffs for the Ford Settlement Grant, and the FHWA and NHTSA as members of the NCAC Cooperative Agreement. These organizations entrusted the NCAC and me to carry out very important research. They donated or contracted millions of dollars with the hope that our organization would be able to make a difference in saving lives and preventing terrible injuries. Though I worked very hard to deliver great results, I took advantage of that trust to serve my own interests. I am deeply sorry for what I have done; my actions were totally inexcusable. I wish to apologize to these sponsors and hope that my actions have not prevented future contributions to such a worthy cause.

I also recognize that I damaged George Washington University and clouded its reputation. I have done all that I can to undo the monetary damage. I am genuinely sorry that my actions contributed to damaging their relationship with the Federal government and wish that there was something that I could do to remedy that. I hope that by admitting my conduct, the people that remain at GWU will find it easier to regain that trust.

### *Confrontation and Restitution – The Financial Element*

In May 2004, I learned that GW was conducting an internal audit of the NCAC accounts associated with a Cooperative Agreement between GWU, the Federal Highway Administration (FHWA), and the National Highway Traffic Safety Administration (NHTSA). I also learned that my cousin, Dr. Nabih Bedewi was being investigated for misuse of funds and conflicts of interest between his role as NCAC Director and three outside companies.

In July 2004, I was informed by GW that several staff members, including me, were being investigated for potential misuse of funds. Although I was initially inclined to continue my denial, with the assistance of my attorney I realized quickly that there was little point. Thus, in August 2004, approximately 30 minutes into an interview with GW's outside auditors that was scheduled to last at least an entire afternoon, my attorney and I adjourned the meeting, and I began the process of admitting what I had done. Over the next two days, we reviewed every expense on the P-Card statements, including all the backup material I had submitted during my two years at GW, and identified any expense that was even arguably improper.

Later that week, we returned to the auditors' offices and offered full restitution for both the stipend and the improper use of the P-Card. In addition to the $36,000 for the stipend, we identified almost $44,000 in P-Card expenses. I offered to pay $80,000 immediately *and agreed to further restitution in the event that the auditors identified other improper expenditures* (though I was confident that they would not). Over the following week, I obtained a second mortgage on my home and gave GW a check for $80,000. This was accomplished in August 2004, well before GW had even made its report to the United States Attorney's Office and long before that office contacted my attorney to advise him that I would be subject to criminal prosecution, which did not occur until several months after the prosecutors received GW's report.

GW made no additional demand in the 22 months following my $80,000 payment. In the interim, federal investigators reviewed my P-Card expenses in connection with my pleading guilty. I was pleased that their review confirmed that my $80,000 payment had covered all the items they identified with money left over. Although GW has recently asked for more money, I am confident that I have paid back all that I improperly took. I want to assure the Court that if I believed that my payment in August 2004 was not truly full restitution, I would find a way to make another payment. But that is not the case. It is also not true that the money I was paid by the MVFRI came from money that belonged to GW. GW is wrong is its saying that I cheated it and the MVFRI; I did the work that I listed on my invoices to MVFRI without cheating GW out of the work it was entitled to from me.

### *Confrontation and Appreciation of My Conduct – The Psychological Element*

The process of coming to terms with my conduct has required me to examine it and try to understand why I allowed myself to do these things. As I have said, when my cousin essentially gave me and others at the NCAC permission to spend someone else's money on things unrelated to the reasons we had that money, I set aside my sense of right and wrong and took full advantage of the situation. When GW began its internal investigation, I was still in the mode of self-justification. But back in August 2004, during the initial meeting with GWU's auditors, my attorney pulled me aside. He helped break my rationalizing and minimizing the wrongness of my behavior when he asked me a question that I could not answer: If I genuinely thought I was justified in spending our sponsors' money to give myself and colleagues the meals and the travel

and the golf fees and everything else, why hadn't I just gone to the sponsors and told them how I intended to spend their money or given them an honest accounting of how I spent their funds?

The question was simple, but its impact was immediate and devastating. It was at that moment that the light bulb finally clicked on. That is when my attorney and I immediately began the task of reviewing all of my expenses and compiling a figure for restitution. In reviewing each and every expense, if I would be embarrassed to tell a sponsor about the true nature of an expense and why it was incurred, it went on the list.

My attorney also asked me to think about how I would feel if, for example, he charged me for several hours work when he was in fact out at a fancy dinner secretly paid for with the fees from the nonexistent work, offering as a "justification" that his rates were below that of other lawyers or that he had done an extraordinarily good job? I realized that the abstractness of the sponsor and the amount of money at issue did not change the fundamental principle: I had cheated them .

These realizations, I truly believe, have done more than simply open my eyes to my past conduct; rather, they have established benchmarks by which to measure my conduct toward clients and others who may entrust me with their money, or their property, or their well-being, Having taken a cold , hard look at my conduct at GWU, I appreciate that if I ever feel like I need to hide what I am doing or intend to from people who have given me their trust, I had better take a look at what I am doing, because I will once again be cheating someone out of something. And that can never be "innocent" conduct.

There has been another series of events that has occurred since my resignation from GWU that has further reshaped my fundamental attitude and way of life. In August 2004, at nearly the same time as my resignation from GWU, my father began experiencing various medical issues. Nearly 12 months later he was diagnosed with pancreatic cancer. Over the next 13 months he battled this aggressive and devastating disease. He lost his battle on August 13, 2006.

This was the first time in my life that I lost a close friend or family member. My father was very close with me and our relationship was strong. There is some important history to his character and our relationship. My father was born in Cairo, Egypt and raised in a devout Christian family. He was an Olympic gymnast in 1952 and used his athletic talents to earn money for his college education. When the regime changed in Egypt to Muslim control, his family lost nearly all they had built. My father did not pick up arms, but simply faced the situation he was dealt and took action to rise above such conflict and closed-minded mentality. He risked his life in traveling to Syria and escaping on foot through the mountains into Lebanon. From there he traveled to the United States to live in a land that encouraged freedom and success.

He arrived with nothing more than the clothes on his back, not even speaking a word of English. On his first morning in the States, he went out and vowed not to return until he found a job, which he did. His life to that point was a very interesting series of events. At all times his desire to seek and make opportunities happen was coupled with an intense inner drive to be successful. As his son, it's easy to see why his expectations were always so high for me. He never expected anything less of himself. Because of his background, he was very familiar with a life where opportunity is taken away by governments or society. As a father he was always determined to provide opportunity to me. He knew every day on earth was special and he wanted everyone around him to know it.

My father always put everyone else's lives and needs ahead of his own. He was a man of great integrity, hard working, and deeply loving. He was the ultimate provider to everyone he interacted with. He was more rewarded by the success of others rather than his own. To the very end his biggest concern was not that his physical body was deteriorating in front of him, but how he was going to continue providing us the opportunities to succeed. He cried, not from physical pain, but from sadness that his wife, children, and friends might not have all that they need.

In the end he found peace in the realization that physically he had already provided everything we needed to continue and pass on his legacy for generations to come, and spiritually he would always be there with us. He set an amazing example for how to live one's life, how to provide and seek opportunity for ourselves and those around us.

Because of his illness, I felt that I could not further burden him by telling him about what I had done at GWU or that I was pleading guilty to a felony. I felt that the disappointment and anguish I knew he would experience would have disrupted his fight with cancer and ended his battle prematurely. Even if he had not been so sick, it would have been excruciating for me to have that conversation with him for fear of facing his disappointment and anger; but I know I would have found the strength to face him. To this day my inability to talk with him about this excruciating event has made my own pain and disappointment in myself that much greater. When I left GWU and began working in the Real Estate profession, he couldn't understand why I was throwing away all of my years of hard work to switch professions. To him, this was a bad decision on my part, but he supported me and advised me as I started the new business.

During this process, I did a lot of soul-searching. I looked back at how I was raised by my parents, how I was taught to live my life, and how I was taught to help others. It sickens me to think about my behavior at GWU. My father taught me to be a leader and instead I became a mindless follower. I was raised better than that, but I allowed myself to push aside what he had taught me. And I have always thought of myself as a pretty smart guy, but today I feel like an idiot for having allowed myself to be seduced by a fundamentally corrupt way of looking at the world.

Again, the recent events of my life have allowed me to set benchmarks for how I must handle myself now and in the future. Even though I never discussed my situation with my father, I know exactly what he would have said, how he would have felt, and how he would have reacted. Furthermore, I know how he would have challenged me to admit what I had done, to recognize my failure, to do everything in my power to make amends, to learn from my actions, and to not to do things that make me feel like I need for me to lie to myself or others about my behavior. Carrying on my father's legacy involves helping and providing opportunity for others; setting the proper example for my children; looking out for the best interest of others both personally and professionally; and being a leader.

### Rebuilding My Life

Upon my resignation from GWU, and with the wide-spread knowledge within the industry of these events, my career as a safety engineer was clearly over. It was difficult to imagine that all of those years of hard work and higher education were now gone; however, the only option I had was to rebuild.

I enrolled in the coursework required to obtain a real estate license. In October 2004, I applied for my real estate license following completion of the coursework and successfully passing the national and state exams. Upon receiving my real estate license, I affiliated with RE/MAX Premier and Broker/Owner Tom Donegan. Mr. Donegan is a tremendous person who has helped me during this rebuilding process. I immediately enrolled in several educational courses and seminars and obtained numerous other educational resources to gain the knowledge required to become a skilled real estate sales agent. Together with Mr. Donegan, I developed a detailed business plan to guide me in this new business. I have worked incredibly long hours, but I am able to feel like things are coming together.

Being affiliated with Mr. Donegan has been a wonderful experience in my life. He is a man that is so well respected in the real estate industry as someone who adheres to the highest ethical standards and conducts himself and his business with honesty and integrity. I feel fortunate to have him as both a model and a supporter.

I have learned many serious and valuable lessons from this ordeal. By going through this process I have come to understand that when I am given the chance to succeed, I don't have to use it as an opportunity to take unfair advantage of others. I have learned that, if at the end of the day, I cannot honestly tell my children about how I treated other people that day, then I had better change my behavior. I have learned that if I feel like a hypocrite when I tell my children not to lie, cheat, or steal and that the trust of others is one of the most precious things they will ever be given, then I am doing something wrong. I know that my father and mother taught me these principles, and I wish that it had not taken this awful experience to fully appreciate them. But there is little that I can do about the past except make the amends that I have tried to make. What is most important to me is applying these lessons as I move forward, possessed of a deeper appreciation of the principles that I must adhere to in all aspects of my life.

### Sentencing

As far as my sentencing is concerned, I am prepared to accept whatever you deem is appropriate for my actions. I hope that you can consider some of the positive things I have tried to achieve for myself and others before and after my years at GWU. I have tried to do all that I can to make amends for my behavior at GWU.

I would like to be able to continue providing for my wife and three small children (ages 6, 4, and 2) I am the only source of income. Leaving GWU and spending large chunks of time in Arizona with my father have wiped out our reserves.

I recognize that I will undergo some form of confinement and I understand that the Sentencing Guidelines call for my being sent to prison. I also understand that the Court does not absolutely have to follow them. I hope that some of my conduct before and after GWU will cause you not to follow them completely. Please appreciate that I am not trying to bargain with the Court, but if it is possible to give me a longer period of confinement than you might otherwise choose to impose where I could still work, I am asking that you consider this as a possibility.

I would like to close by recounting a conversation I had with Mr. Tom Donegan that has greatly affected my perspective. When discussing my wrongdoings with him, he mentioned that he lives his life under the concept that "the truth will always set you free." While this is a commonly used expression, it had never had the impact on me that it had at that moment. Spiritually, this is a powerful statement. I never need to justify my actions if they are guided by truth and integrity.

I cannot change the past nor my wrongdoings.  All I have in my power is to make amends and ensure that my future actions are guided by these principles.

I know that at some point I will agin be in a position to move forward and redeem myself. Mr. Donegan has challenged me and I have accepted his challenge. He emphasized that this will forever be a defining moment in my life. The true measure of my character will start from this point forward and I must show what I am truly made of. I know that I have the ability to do something positive with my life for my family and my community.

I feel like I have started down the right path by admitting what I did and making amends. I feel like I am  prepared to accept the punishment that you will impose.  I look forward to the day when my positive contributions to society far outweigh these negative actions.

I am grateful for the time you have spent considering my case and sorry that you have come to know me in this light.

Respectfully,

*Paul Bedewi*

Paul Bedewi

Exhibit 3
United States v. Bedewi
Cr. No. 05-303-01

DR. STEPHEN W. ROUHANA

| 47363 Adams Ct
| Plymouth, MI 48170-3416
| Phone: (734) 377 8564
| srouhana@comcast.net

8 November 2006

Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC  20001

Re: United States v. Paul Bedewi

Dear Judge Roberts:

I am writing on behalf of Paul Bedewi, who is pending sentencing before you on November 14, 2006 on the charge of violation of 18 U.S.C 666.  Dr. Bedewi is a friend and former employee and co-worker whom I have known for approximately 6 years. I am a Senior Technical Leader in Safety at the Ford Motor Company and have spent the last 23 years in pursuit of safer automobiles for society and the world at large. I was recognized with the US Government Award for Safety Engineering Excellence in 2003 and this year was selected as one of only 32 members of the Society of Automotive Engineers to become a Fellow of the society.

As Dr. Bedewi's boss and co-worker, I had daily contact from approximately July of the year 2000 until the time he left Ford Motor Company in 2002. During the years that I worked with Paul, he showed himself to be an outstanding employee who worked extremely hard, yet treated everyone with respect and decency. I was always pleased by the way Paul would treat all people, from the janitors to the bosses with the same dignity and respect. He is extremely bright, dedicated, and self-motivated. I also observed him to be a devoted husband and father, whether we were at home or on the road, as we took many business trips together. And, I know many people who know Dr. Bedewi, and have held him in high regard.

I received a phone call from Dr. Bedewi yesterday, in which he explained the offenses that occurred at the NCAC of George Washington University and he took responsibility for his role in them. In my opinion, he was clearly embarrassed by his actions, acknowledged that they were wrong, and sounded genuinely sorry that he had done what he had done. The kind of conduct that Paul described is certainly not anything that I ever observed him do, nor was it anything I would ever expect from Paul in a million years.

Your Honor, I would imagine it is very difficult to have to decide on a daily basis what actions, relative to those who stand before you, would best serve society. I don't have to imagine, because I know, that we all make mistakes. My philosophy has always been to forgive trespasses of those who admit that they made a mistake. I do believe that Paul is sorry for what he has done and that he will never let anything like this ever happen again. I do not believe that society's best

Hon. Richard W. Roberts, 8 November 2006                                    Page 2

interests will be served by incarcerating him and allowing his children to be without their loving dad for any period of time.

I want to thank Your Honor for taking the time to read this letter, and I hope it is helpful to you in reaching your sentencing decision. Please feel free to contact me at the email address noted in the letterhead if you should require further clarification of anything I have said.

Respectfully and sincerely yours,

Stephen W. Rouhana, Ph.D.

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

**ATTORNEYS AT LAW**

**1747 PENNSYLVANIA AVENUE, N.W.**
**Third Floor**
**WASHINGTON, DC 20006-4604**

————

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

STEVEN C. TABACKMAN
WRITER'S DIRECT DIAL: (202) 454-2811
EMAIL: stabackman@tighepatton.com

September 18, 2006

**By Overnight Mail**
Ms. Christine Martine
Executive Director
Real Estate Board
Department of Professional and Occupational Regulation
3600 West Broad Street
Richmond, Virginia 23230

Re:  Paul Bedewi – Real Estate Salesperson License #0225086190

Dear Ms. Martine:

I represent Paul Bedewi in the case of *United States v. Paul Bedewi* in which Mr. Bedewi is pending sentence following his guilty plea in the United States District Court for the District of Columbia to a violation of 18 U.S.C 666, which penalizes wrongfully obtaining money from an institution that receives federal funds, irrespective of the federal nature of the funds in question.

I know that you have been expecting this letter for some weeks now following the letter you received in June from Thomas Donegan, the broker for whom Mr. Bedewi works. I also appreciate that notification of Mr. Bedewi's conviction should have been made when he entered his plea (an obligation of which I was unaware at that time). I will address the notification delay below. As for the more recent passage of time, it has been occasioned by Mr. Bedewi's need to be with his father in Arizona. In late 2005, the elder Mr. Bedewi, who passed away two weeks ago, was diagnosed with pancreatic cancer. In June he had a significant downturn in his condition, bringing home to Paul the reality that his father's death could occur at any moment and in all events was likely to occur quite soon. As he already had been traveling to Arizona frequently to see his parents, Paul decided that he wanted to spend as much time as he could with his father.

Because of the critical importance of the letter that Paul would be writing to the Board, I was concerned that while he was trying to deal with one extremely painful event, he would not be able (and, with so much at stake, should not be asked) to write about a second deeply painful event. I was also aware that Paul had not told his father of his conviction, a further complication to his giving the letter sufficient attention while in his parents' home. In addition, I could not send this letter (that is, the portion of the submission for which I am the author) to you without

Exhibit 2
United States v. Bedewi
Cr. No. 05-303-01

Ms. Christine Martine
September 18, 2006
Page 2

his first reviewing it, another task that I did not want to saddle him with under the circumstances.
I hope that the reason we did not get this material to you weeks ago will to some degree mitigate
our lateness.

In addition to the referenced statement from Mr. Bedewi, I am forwarding certified copies of
the Information, which sets out the charge, and the Plea Agreement, which sets out the
obligations of the parties in connection with the guilty plea and some ancillary issues.   With
respect to the latter document, I would invite your attention to ¶ 5, which addresses Mr.
Bedewi's then-anticipated assistance to the prosecutor and investigators concerning questionable
activities at GW other than those involving either himself, his cousin (Nabih Bedewi, a former
GW professor), or his colleagues at the National Crash Analysis Center ("NCAC") of which
federal officials were already aware.

Subparagraph (e) imposed upon Mr. Bedewi an absolute prohibition on disclosure "to *any*
person or entity *the fact of or details regarding* his cooperation with  law enforcement
authorities." The prohibition against disclosing even "the fact of" his interrogation was, of
course, to minimize the risk that persons who Mr. Bedewi might identify would learn of the
matters discussed and try to undermine the investigative effort.  As you might imagine, he
received repeated admonitions about the importance of his maintaining confidentiality and the
consequences that could attend his failing to do so.  As a result of his literal reading of ¶ 5(e) and
the repeated reinforcement of its message by the authorities, led Mr. Bedewi to conclude –
erroneously, but nonetheless in good faith – that disclosure even to a government licensing
agency would violate his Plea Agreement.

Although I appreciate that the implicit obligation to report to the Real Estate Board that he
was no longer in compliance with the licensing requirements set forth at Virginia Administrative
Code §§ 18-135-20-30(4) following his conviction is Mr. Bedewi's, I must share some of the
responsibility for this failure.  Had I focused on Mr. Bedewi's status as a licensed professional in
a regulated industry, I would have anticipated the reporting requirement and advised Mr. Bedewi
that his obligation to maintain the confidentiality of his guilty plea could not override his
regulatory obligation.  But however one apportions responsibility for this non-compliance, it was
not motivated by a desire to hide his conviction from licensing authorities or to evade the
potential consequences that might attend his satisfying this obligation.

This submission has two elements: this letter and Mr. Bedewi's appended personal statement.
I am pleased to forward his statement and the information set out in this letter pursuant to and
Va. Code Ann. § 54.1-204 to the Real Estate Board as it considers Mr. Bedewi's request that he
be  permitted to maintain his real estate license notwithstanding his felony conviction.  His
statement reflects his personal effort to recount the conduct which underlies his conviction and
the events that took place in August 2004, when he forthrightly acknowledged his wrongdoing to
GW's investigators and within two weeks of that disclosure made financial restitution to GW (in
an amount that was later determined by federal authorities to exceed his actual financial
obligation).  He also recounts his intense and often painful self-examination over the past two
years.   I hope that after you have considered the information we provide in these documents, as
well as the letter from Mr. Donegan and any other information that you may gather by

Ms. Christine Martine
September 18, 2006
Page 3

independent investigation, you will agree that permitting Paul Bedewi to keep his license presents no threat to the public or to the integrity and reputation of your profession.

Turning to the substantive information that I would like to convey, I will divide this letter into two principal sections. The first section sets out a factual exposition of Mr. Bedewi's background and accomplishments prior to his becoming an employee of GW and the NCAC. The second section offers my observations of Mr. Bedewi over the past two years. This includes my assessment of his current commitment to leading a life that will ultimately cause anyone who might learn of this episode to conclude that the conduct he has acknowledged is an aberration.[*]

### *Paul Bedewi Prior to His Employment at the NCAC*

#### *High School and College*

Mr. Bedewi was raised in Arizona as the youngest of four brothers. Although born in Phoenix, he went to school in Tempe, where he graduated Tempe High. Because of the many Advance Placement courses that he took, his high school graduating GPA exceeded 4.0. As a result of this extraordinary performance, he received an academic scholarship for full tuition to be applied at any of the public universities in Arizona; he chose Arizona State University (ASU), where he enrolled in 1989. (It is worth noting that he also received an athletic scholarship from ASU. His substantial athletic achievements are described below, as I believe they reflect on his character and his commitment to excellence in all fields of endeavor that he undertakes.)

At ASU Mr. Bedewi continued his record of academic and athletic excellence. He chose Biomedical Engineering as his major and was selected as the outstanding Biomedical Engineering student in his graduating class. In addition, he had the highest grade point average in the School of Biomedical, Chemical, and Materials Engineering. He graduated *magna cum laude* from ASU in May 1994.

As noted, Mr. Bedewi's substantial achievements as an athlete in the demanding field of competitive gymnastics reflect the same drive to excel that is manifested his academic performance. As a high school senior was the state All-Around Champion, the individual champion on 5 of the 6 men's events, and runner-up on the remaining one. He also competed at the regional and national levels throughout his high school years and won a position on the U.S. Junior National Team.

At ASU, he competed in the NCAA gymnastics championships as well as in several international competitions. In addition to a ranking within the top ten in all-around gymnastics, he was named to the NCAA Academic All-America 1st Team all four years and was a finalist for the Nissen Award, presented to the nation's top male gymnast. As reflected in his teammates'

---

[*] My opinion in this regard is informed by my having served as a federal prosecutor for 10 years (1978-1988) in the United States Attorney's Office for the District of Columbia; as a former Associate Independent Counsel for two years (1992-1994); and as a private practitioner whose practice has been principally focused on the representation of "white collar" defendants in criminal matters, civil penalty matters, and administrative sanction cases. This last group is comprised principally of cases involving the representation of lawyers, doctors, and accountants before their respective licensing boards in D.C. and Maryland.

Ms. Christine Martine
September 18, 2006
Page 4

decision to name him their captain in his sophomore, junior, and senior years, Mr. Bedewi evidently exhibited desirable traits in addition to his gymnastic proficiency.

### Graduate School

Although Mr. Bedewi was under consideration for admission by some of the outstanding engineering schools in the country, he chose George Washington University's program largely in deference to his first-cousin, Dr. Nabih Bedewi, who was in the midst of setting up the NCAC to study current and future transportation safety issues. In addition to the attraction of working with a more senior family member for whom he (and his family) had both respect and affection, the focus of this new program fit well with Mr. Bedewi's biomechanical training during his undergraduate years.

He enrolled in September 1994 and received Master of Science (M.S.) in August 1995. He immediately enrolled in the doctoral program at GWU and completed his coursework over the following twelve months, achieving the highest test scores among the doctoral candidates. Thereafter, he wrote his dissertation and received the degree of Doctor of Science (D.Sc.) in May 1998.

### Post-Graduate Employment

After working for several months at the NCAC, Mr. Bedewi accepted an offer from Ford Motor Company in October 1998 to work as a Technical Specialist in the Safety Research & Development Department, concentrating on technologies and safety designs for all future automobiles. His research included the development of advanced safety systems and numerous technologies to minimize the risk of injury and fatalities in automotive crashes. Once again, he quickly demonstrated that he was not going to be a "middle-of-the-pack" employee. He initiated various safety awareness programs in the Dearborn community and delivered lectures at the Henry Ford Academy regarding the pursuit of a career in science and technology.

He also became a Certified Child Safety Seat Technician, performing child-safety seat checks in the community on a monthly basis and teaching parents the importance of installing and properly using child-safety seats. He became involved Ford's "Boost America Campaign," a program that provided more than one million booster seats to families throughout the United States along with training on their proper use.

His outstanding performance resulted in substantial salary increases, increased benefits, performance bonuses, and stock options. He obtained two patents as a result of his research and his findings were featured in several of the leading technical journals and at significant industry and academic conferences. In 2003, he received an award for the top technical paper in the Stapp Car Crash Journal, the leading research publication for automotive occupant safety.

### Return to NCAC

Up to the point in his career when his cousin urged him to return to GW, Paul Bedewi was, from the achievement perspective, a star, perhaps a superstar. Moreover – and of greater pertinence to your inquiry – there is not a hint that Paul Bedewi was anything other than a man of the highest integrity, recognized as a leader both by his superiors and his peers.

Ms. Christine Martine
September 18, 2006
Page 5

Unfortunately, he decided to return to GW, where he came under the tutelage of his cousin (who is currently serving a substantial sentence as a result of his criminal activities, which were far more extensive than Paul's and infected other employees of the NCAC in addition to Paul). Paul's letter addresses his years working at the NCAC, the attitude he developed in the environment established by his cousin, and the actions that he rationalized. I will offer some comments on this conduct in a moment and suggest how you might choose to view it. But before that, it is important to view his conduct after leaving GW.

Simply put, one sees Paul Bedewi once again becoming the creative and industrious man of integrity who sets high standards for himself and achieves them. As Thomas G. Donegan wrote in his letter to you:

I have found Mr. Bedewi to be honest and forthright in all my dealings with him. In the year and a half he has been in my company, he has earned a reputation as an excellent agent, a very hard worker and a compassionate and caring person, by his fellow agents and clients alike. This conviction is truly a shock to me and seems almost impossible to be true of the man I have come to know and trust.

Indeed, despite his appreciation of the potential risk involved in letting an admitted felon work in his company, Mr. Donegan is emphatic when he states, "I do not want to terminate his affiliation with my firm at this time."

### Post-NCAC

I have spent a substantial amount of time with Paul Bedewi over the past two years and have had the opportunity to watch him as he has dealt with his conduct. We keep in touch regularly and try to meet as often as schedules permit or circumstances require. The Paul Bedewi that I met in August 2004 is a far different person than the one I know today. When we first met, he exhibited an arrogance and sense of entitlement that are the hallmarks of the numerous persons I have dealt with who engage in the kind of conduct that he ultimately admitted. Indeed, even after the facts set out by GW's lawyers and accountants stripped him of any possible defense, his *initial* attitude reflected a belief that GW was treating him unfairly, that what he had done was not a big deal.

Because I perceived the need for Mr. Bedewi to acknowledge and accept the seriousness of his acts in order to put his life back together (and to enable me to suggest steps he might take that might serve to mitigate the severity of the judicial response to his conduct), I put to him the questions that he recounts in his statement. Essentially, I asked him to assume he had to explain his conduct to the people who funded his activities; then I asked him to assume that he was the party who was lied to about how his money was spent. Frankly, for any number of reasons (not least of which is the potentially detrimental impact such a question has on the attorney-client relationship), I do not typically ask a client to put himself in the place of the victimized party. In this instance, however, I decided that that direct confrontation was both appropriate and necessary to Mr. Bedewi's ability to move forward.

The impact of the question on him was immediately obvious. In the roughly 18 months since we had that conversation, Mr. Bedewi has adverted to it countless times. I do not mean to suggest that there is anything novel in ultimate point that my questions were designed to bring

Ms. Christine Martine
September 18, 2006
Page 6

out. I have no doubt that Paul Bedewi not only had been taught the "Golden Rule" but also understood it (abstractly, at least) and generally tried to follow it. But in the atmosphere of the NCAC, Paul Bedewi replaced forgot that principle and bought into the contrary principles expounded by his older cousin.

I do not mean to suggest that because someone else set the tone at the NCAC, the seriousness of his conduct is in any way diminished or that he ought not to have to account for it. This accounting, however, has already begun with his prompt restitution (made long before criminal charges were filed) and in his being forced to forego the success that he surely would have achieved in the profession for which he had trained. Undoubtedly, this process will continue as he satisfies the sentence imposed by the Federal judge.

### Real Estate Practice

Moreover, my confidence that Paul would derive some beneficial lessons from this otherwise dismal episode and incorporate them into his professional life is proving to be justified. That he is doing well doesn't surprise me; he is an obviously talented man with the drive to match. But in the course of our conversations, he has told me about two matters that are both gratifying to hear about and, I believe, merit sharing with the Real Estate Board, as I believe they give some insight into Paul Bedewi today.

In March 2005, Paul was hired by a former neighbor to list her home for sale. She had recently lost her husband to cancer at age 32 and was now widowed, with a daughter of less than 12 months old. In addition to the time and effort he put into ensuring a successful sale, he did two things that I think are particularly noteworthy. Due to his client's work schedule and care of her infant, she did not have the time or resources to prepare her home for sale. Paul took care of everything for her, including helping her move to her new residence; he also donated 50% of his commission (more than $8,000) to her daughter's college fund. This was at a time when Paul had only earned about $10,000 in the preceding 9 months, had exhausted his lines of credit, and had borrowed from his relatives.

He has also shared with me his excitement at having created a new sponsorship program to help support the athletes at local gymnastics' clubs. Through this program he donates a portion of his commissions to the local clubs to assist with the costs of these gymnasts' competing in local and national competitions. In 2005, he donated $3,000 to local clubs. His goal was to double that amount in 2006 (though I suspect that he may need to revise this goal in light of the time he missed while in Arizona with his father). But Paul has spoken often of the things he learned through gymnastics training and competition, and he gets a special satisfaction out of helping along the next generation.

Paul's letter also recounts some other community-centered endeavors in which he is engaged. Together, these salutary events and practices allow me to predict with absolute confidence that the changes he has exhibited so far are genuine and that he will continue to practice the principles he professes in all aspects of his personal and business affairs.

I hope that the information I have conveyed and my personal observations help the Real Estate Board address some of the factors listed in Va. Code Ann. § 54.1-204 as they apply to Mr. Bedewi. While his conduct is undoubtedly serious, the significant (and virtually unique)

Ms. Christine Martine
September 18, 2006
Page 7

environmental component that contributed to his engaging in that conduct greatly diminishes the likelihood of his doing so again. This risk is further diminished by the substantial rehabilitative steps he has taken, which include his restitution and, even more importantly, his willingness to undertake a searching self-examination that has led to a genuine acknowledgment of the wrongfulness of his conduct and a dramatic change in his outlook and behavior in the business world. Accordingly, I respectfully suggest that these factors make him no greater risk, and arguably a lesser one, to his clients and the integrity of his profession than the majority of persons to whom the Real Estate Board has confidently granted licenses and applicants in whom the Real Estate Board will, without hesitation, repose its trust.

If the Real Estate Board has further questions, or if the Board decides to conduct a formal hearing, please contact me. Thank you for your time and attention to this matter.

Sincerely,

Steven C. Tabackman
*Counsel for Paul G. Bedewi*

Enclosure

November 10, 2006

Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re: United States v. Paul Bedewi

Dear Judge Roberts:

I am writing on behalf of Paul Bedewi, who is pending sentencing before you on November 14, 2006 on the charge of violation of 18 U.S.C 666. Mr. Bedewi worked for me for about two years and in that time I was able to get a good impression of his behavior, character and work ethic. I found Paul to be an energetic, capable, and enthusiastic young research engineer that I could rely on to get the job done. In fact, Paul was pleasure to have around. Never once did he exhibit any behavior that led me to doubt his integrity or honesty. He was deeply committed to his family (wife and one child at that time) and his career.

I have spoken with Paul about the matter that brings him before the court. In that conversation, he was up front about his responsibility in the matter, made no attempt to pass the blame elsewhere, and deeply regrets his involvement in the whole affair. When I and other past colleagues of his first came aware of Paul's involvement in this affair, we were stunned. Based on the Paul we knew, we could only conclude that there must be some mistake.

I want to thank Your Honor for taking the time to read this letter, and I hope it is helpful to you in reaching your sentencing decision.

Respectfully yours,

John Sullivan

Exhibit 4
United States v. Bedewi
Cr. No. 05-303-01

**RE/MAX**

**Tom Donegan**
Broker / Owner

November 15, 2006

The Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC 20001

Re:  United States v. Paul Bedewi

Dear Judge Roberts,

I am writing to you on behalf of Paul Bedewi, who is to be sentenced by you on November 30th, 2006 on the charge of violation of 18 U.S.C 666.  While it is certainly troubling to me that Mr. Bedewi pleaded guilty to fraudulent stipend arrangements and procurement card abuses, I want you to know that I believe in him and hope that Your Honor will allow him either house arrest or probation, so that he may continue to work as a REALTOR in my company.

I think I am a good judge of character.  I am a former Army officer, Military Intelligence Branch with eight years active duty, and I'm from a family of 11 children, where my dad and my older brother are both retired FBI agents.  I am the only Broker to have been selected as the RE/MAX Central Atlantic Region Broker/Owner of the Year twice and I'm currently serving on the Metropolitan Regional Information System (MRIS) Board of Directors, which is the largest MLS system in the country.  I am recognized in this industry for maintaining the highest ethical standards and I work hard to instill this in my staff and agents.  I built my company, RE/MAX Premier, over the last 11 years with the stated goal of not trying to get every agent to join, only the good ones.  I use two criteria to determine the worthiness of agents to be in my company:  1) Do they have a good heart?  And 2) are they willing to take responsibility for their actions?  I have found Paul Bedewi to be exemplary in both categories.

Mr. Bedewi has always been honest and forthright in all my dealings with him.  In the two years that he has been in my company, he has earned a reputation as an excellent agent, a very hard worker and a compassionate and caring person, by his fellow agents and clients alike.  In his first year as an agent, he far exceeded my expectations in production by working very hard, focusing on his business plan and always putting the interests of his clients ahead of his own. His results were so exemplary, that I asked Mr. Bedewi if he would mind sharing some of his successful ideas with other agents in the company.  He didn't hesitate and put together a 3 hour seminar that helped several agents increase their productivity.  Your Honor must understand that this is very unusual in this industry.  Most agents are afraid to share their "secrets" with others for fear that others may "steal" their business.  Mr. Bedewi is a true team player, who is not afraid to help others, and is confident in his ability to work hard and compete with anyone. What a great perspective. For these reasons, this conviction is truly a shock to me and seems almost impossible to be true of the man I have come to know and trust.

**RE/MAX Premier**
13135 Lee Jackson Hwy., Suite 115, Fairfax, Virginia 220
Office: (703) 802-2850, Toll Free: (800) 297-8382
Fax: (703) 802-2853, E-mail: tdonegan@remax.net

Exhibit 5
United States v. Bedewi
Cr. No. 05-303-01



⌂ Each RE/MAX® Office Independently Owned and Operated

I believe it would be a just sentence for him to be placed under house arrest or probation for the following reasons. Mr. Bedewi has already made restitution for the money in question, long before there was even a court case. This demonstrates to me that he immediately accepted his responsibility and took action to rectify his wrongdoing. He has admitted his guilt and will have a felony conviction in his record for the rest of his life. He has suffered a great deal of anguish over this and the recent death of his father. Paul is from a very close family and I know that the passing of his dad has greatly changed his perspective on life. I met his dad several times and knew him as a great man, with high ethical and moral standards. I believe in my heart that Paul Bedewi has learned a valuable lesson from this and he will not make the same mistake again. He is a good man and I would like the opportunity to continue working with him in my company.

If you sentence him to house arrest or probation, he will then have to petition the Virginia Department of Professional and Occupational Regulation (DPOR) to maintain his active real estate license status, due to his felony conviction. I will assist him in that effort. I am willing to not only help him maintain his license; I would also accept any responsibility to help monitor his actions, to insure he complies with the requirements of the Court and the DPOR. I believe that the community at large would be best served by Paul continuing to provide the tremendous service to his clients and the community charities which he supports. He has a family with young children and his real estate career is his only source of income at this time.

I'd like to thank Your Honor for reading my letter, and I hope you will consider my comments before you reach your final sentencing decision. If you would like to speak to me, my cell # is 703-798-1093. Thank you.

Respectfully,

Thomas G. Donegan
Broker/Owner

November 8, 2006

Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Ave., NW
Washington, DC  20001

Re: United States v. Paul Bedewi

Dear Judge Roberts:

I am writing on behalf of Paul Bedewi, who is pending sentencing before you on November 14, 2006 on the charge of violation of 18 U.S.C 666. My husband and I have known Paul for almost 2 years and I have worked as a member of his team at RE/MAX Premier for a year and a half. Paul and I have contact on a daily basis and have worked together on 24 real estate transactions. For as long as I have known and worked with him, Paul has acted with honesty and integrity in all of his dealings. He has proven himself to be dedicated to doing the right thing, even in situations where it caused him to forego potential business opportunities.

In my previous career, I worked for a government contractor and held high level security clearances requiring extensive background investigations and regular polygraphs. My husband, Mother and many of my close friends still work in that environment. As a result, we are very discriminating about the people we choose to associate with. Even the perception of any inappropriate associations could jeopardize our eligibility to hold such clearances. When Paul discussed this matter with me, it was obvious that he had not only taken responsibility for what he had done but was deeply remorseful and was dedicated to making it up to his family, friends and society as a whole. One example of Paul's efforts in that regard is his support and sponsorship of the Online Predator Profiling System (OPPS). Paul purchased the licenses for this state-of-the-art software for both Loudoun and Fairfax County. Further, he continues to try to locate sponsors for other jurisdictions that could benefit from the software.

Paul's devotion to his wife Mary Kay, and children Amira, Max and Senator is obvious to anyone who knows him. He and I have many mutual friends, acquaintances and colleagues, and I have never heard any of them speak a bad word about him. Paul is very well respected and known to be a man of integrity. I can say with confidence that any client that Paul has represented while in the Real Estate business would have nothing but outstanding things to say about him. In fact, you would be hard pressed to find anyone at all that had something negative to say about Paul.

I believe that the actions that brought Paul here today are extremely out of character for him and have complete confidence that they will not be repeated in the future. During the time I have known Paul, he has earned my respect, trust and admiration and I am proud to call him a friend.

I want to thank Your Honor for taking the time to read this letter, and I hope it is helpful to you in reaching your sentencing decision.

Respectfully yours,

Cheryl Thomas

Exhibit 6
United States v. Bedewi
Cr. No. 05-303-01

# Dan Wasserman
20953 Cohasset Terrace
Ashburn, VA 20147
703-726-3993

November 2, 2006

Honorable Richard W. Roberts
United States District Court for the District of Columbia
333 Constitution Avenue, NW
Washington, DC, 20001

Dear Judge Roberts,

I am writing on behalf of Paul Bedewi, who is pending sentencing before you on November 14, 2006 on the charge of violation of 18 U.S.C. 666. Mr. Bedewi is a past neighbor and a current business colleague whom I have known since he moved across the street from me in 2002. Recently, Paul has been directly responsible for a number of successes at the company I work for, AdZone Research, Inc.

Specifically, my company developed the Online Predator Profiling System (OPPS), a database of several hundred internet chat rooms, which we monitor and store all of the activity. Federal, State, and Local law enforcement can utilize OPPS in an attempt to control the ever-growing issue of online predators. It allows them to identify and track potential predators.

We quickly received numerous license requests from all over the country. Unfortunately, many law enforcement agencies did not have the budgets to purchase the licenses. I approached Paul with an opportunity to sponsor licenses for the local agencies. With his technical background, Paul immediately began researching the OPPS product and spoke with numerous law enforcement personnel working on these types of activities. He concluded that this was a valuable resource and the local agencies needed this tool immediately. Paul graciously paid for the first ever licenses of this product for Fairfax and Loudoun Counties, which cost him $1998 ($999 each).

His energy and belief in the ability to make a difference with the widespread utilization of OPPS didn't stop at a simple sponsorship of two licenses. He took the concept of sponsoring licenses to numerous others that he knew in the community, leading to the sponsorship of OPPS licenses in other Washington D.C. area jurisdictions. By doing this, Paul enabled OPPS to go live in other D.C. area communities and his initiative permitted my company, along with our partner Web Wise Kids, to become part of the 2006 Redskins/Booz Allen Hamilton Yards for Youth campaign. In this campaign, the Washington Redskins Charitable Foundation promotes sponsorship of our community based initiatives and matches sponsorships dollar for dollar. Our goal with the Redskins is to equip 250 schools and 49 law enforcement agencies with our comprehensive approach to keeping children safe online. Paul made all of this possible. He has never looked for recognition for all of his help and support. He has done this because he believes it is the right thing to do for our community and our children. As a father of three small children he knows the dangers they may face and wanted to do something to help.

Exhibit 7
United States v. Bedewi
Cr. No. 05-303-01

It is in this light that I know and respect Mr. Bedewi. His dedication to family, community, and the greater D.C. area are self-evident. He is a true community supporter and deeply upset about the fact he wound up in the current legal situation. He was very upfront and honest with me about his actions. He openly admitted his guilt to me and remorse for what he has done. His actions relative to this legal situation were a shock to me. It is truly out-of-character for Paul. What is in-character for Paul are his actions since. He has shown how to learn from his mistakes, apply his great abilities, and become a better person.

Paul is a valuable asset to our society. He has the ability to recognize programs and opportunities that benefit the local communities, and the personal drive to make the opportunities a reality. His current profession of real estate gives him even greater access to do good deeds where ever he can. I am convinced that if he is given the opportunity to continue to help others, he will make an incredibly positive impact on our community, now and in the future.

Thank you Your Honor for taking the time to read this letter and I hope it assists you in reaching your sentencing decision.

Respectfully,

Dan Wasserman