## Paul G. Bedewi
### GWU P-Card
### Account # . . . 200869

| Pkg. # | Stmt. Date | Transaction # | Transaction date | Vendor | Location | Amount | Time on receipt | Approval |
|---|---|---|---|---|---|---|---|---|
| 1 | 8/21/02 - 9/20/02 | | | | | | | |
| 2 | 9/21/02 - 10/21/02 | 7 | 9/27/2002 | Nobu | | 584.05 | | AE |
| | | 8 | 9/28/2002 | Bellagio - Shintaro | | 183 | | AE |
| | | 9 | 9/29/2002 | Jaguars | | 100 | | AE |
| 3 | 10/22/02 - 11/20/02 | 11 | 10/13/2002 | AT&T Wireless | | 186.46 | | AE |
| | | 3 | 10/30/2002 | Best Buy | | 220.95 | | |
| | | 5 | 11/1/2002 | Lebanese Taverna | | 206.3 | 11:09 p.m. | |
| | | 15 | 11/9/2002 | Bourbon St. Raw Bar | Jacksonville, FL | 64 | 12:52 a.m. | |
| | | 16 | 11/9/2002 | Ruth's Chris Steak House | Ponte Vedra, FL | 205 | 22:34 p.m. | |
| | | 19 | 11/2/02 - 11/13/02 | Sawgrass Marriott Resort | Ponte Vedra, FL | 2329.19 | | NB |
| 4 | 11/21/02 - 12/20/02 | 11 | 12/8/2002 | Merchants ? Wine | Dearborn, MI | 57.19 poor original | | NB |
| | 12/21/02 - 1/2/03 | 6 | 1/15/2003 | AT&T Wireless | | 169.54 | | NB |
| 5 | 1/21/03 - 2/20/03 | 11 | 2/13/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 9:26 a.m. | NB |
| | | 12 | 2/12/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 4:32 p.m. | |
| | | 1 | 2/20/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 9:40 a.m. | |
| | | 7 | 3/3/2003 | Bohered Corp. | Detroit, MI | 130 poor original | | |
| | | 8 | 3/4/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 4:10 p.m. | |
| 6 | 2/21/03 - 3/20/03 | 11 | 3/5/2003 | La Shish Van Dyke | Warren, MI | 85 poor original | | |
| | | 14 | 3/6/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 9:47 a.m. | |

DRAFT 3-7-05

Exhibit 8
United States v. Bedewi
Cr. No. 05-303-01

**Paul G. Bedewi**
**GWU P-Card**
**Account # . . . 200869**

| Pkg. # | Stmt. Date | Transaction # | Transaction date | Vendor | Location | Amount | Time on receipt | Approval |
|---|---|---|---|---|---|---|---|---|
| 7 | 3/21/03 - 4/20/03 | 22 | 3/9/2003 | Best Buy | Sterling, VA | 1034.95 | 2:34 p.m. | ✓ |
| | | 26 | 3/11/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | 11:17 a.m. | NB |
| | | 2 | 3/25/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | | ✓ |
| | | 5 | 3/28/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | | ✓ |
| | | 6 | 3/31/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | | ✓ |
| | | 12 | 4/9/2003 | Landsdowne Resort | Leesburg, VA | 248 | 7:48 p.m. | ✓ |
| | | 14 | 4/10/2003 | Beacon Hill Country Club | Leesburg, VA | 2500 | | ✓ |
| | | 16 | 4/11/2003 | Beacon Hill Country Club | Leesburg, VA | 5 | 11:45 p.m. | |
| | | 17 | 4/11/2003 | Expedia.com | | 894.43 | 11:45 p.m. | NB |
| 8 | 11/21/02 - 12/20/02 | | | | | | | NB |
| 9 | 4/21/03 - 5/20/03 | | | | | | | NB |
| 10 | 5/21/03 - 6/20/03 | 25 | 5/14/2003 | Beacon Hill Country Club | Leesburg, VA | 1875 | | Ken Digges |
| | | 22 | 5/12/2003 | Beacon Hill Country Club | Leesburg, VA | 1875 | | ✓ |
| | | 2 | 5/22/2003 | Beacon Hill Country Club | Leesburg, VA | 1875 | | ✓ |
| | | 18 | 6/5/2003 | Babies "R" Us | Sterling, VA | 240.34 | 10:59 a.m. | |
| | | 24 | 6/12/2003 | Beacon Hill Country Club | Leesburg, VA | 1352.09 | 1:19 a.m. | |
| | | 26 | 6/15/2003 | Travelocity | | 1105.8 | | |
| | | 27 | 6/15/2003 | Travelocity | | 5 | | NB |
| 11 | 6/21/03 - 7/20/03 | | 7/12/2003 | Navigator of the Seas | | 1353.06 | | ✓ |
| | | 1 | 7/17/2003 | United | | 466.5 | | NB |
| | | 2 | 7/17/2003 | United | | 600.5 | | NB |
| 12 | 7/21/03 - 8/20/03 | | #6 - #13 | | | | | |
| | | 7 | 7/30/2003 | Beacon Hill Country Club | Leesburg, VA | 404.7 | poor copy | |
| | | 21 | 8/8/2003 | Expedia.com | | 10 | | |
| | | 27 | 8/8/2003 | Expedia.com | | 396 | | ✓ |

DRAFT 3-7-05

2

**Paul G. Bedewi**
**GWU P-Card**
**Account # . . . 200869**

| Pkg. # | Stmt. Date | Transaction # | Transaction date | Vendor | Location | Amount | Time on receipt | Approval |
|---|---|---|---|---|---|---|---|---|
| 13 | 8/21/03 - 9/20/03 | 28 | 8/8/2003 | Expedia.com | | 396 | | NB |
| | | 30 | 8/9/2003 | United | | | | NB |
| 14 | 9/21/03 - 10/20/03 | 1 | 8/20/2003 | Beacon Hill Country Club | Leesburg, VA | 280.71 | | NB |
| | | 33 | 10/10/2003 | Hertz | Las Vegas, NV | 170.57 ✓ | | |
| | | 34 | 10/12/2003 | Nobu | Las Vegas, NV | 580 | | |
| | | 35 | 10/12/2003 | Marriott | Las Vegas, NV | 327.39 ✓ | | |
| | | 36 | 10/12/2003 | Marriott | Las Vegas, NV | 276.5 ✓ | | |
| | | 37 | 10/15/2003 | Dulles parking | Las Vegas, NV | 45 ✓ | | |
| 15 | 10/21/03 - 11/20/03 | 4 | 7/10/2003* | Courtyard Marriott | Dulles, VA | 541.97 | | NB |
| | | 7 | 10/24/2003 | Hooters | San Diego, CA | 19 | 10:42 p.m. ✓ | ✓ |
| | | 10 | 10/26/2003 | Hooters | San Diego, CA | 47.45 | 3:06 p.m. ✓ | ✓ |
| | | 13 | 10/27/2003 | Maloney's Tavern | San Diego, CA | 110 | 11:31 p.m. ✓ | |
| | | 14 | 10/28/2003 | Hooters | San Diego, CA | 56 | 11:55 p.m. ✓ | ✓ |
| | | 23 | 11/4/2003 | Beacon Hill Country Club | Leesburg, VA | 724.62 | 2:07 p.m. | |
| | | 30 | 11/11/2003 | Sheraton Univ. Club | Philadelphia, PA | 147.06 ✓ | | |
| | | 31 | 11/11/2003 | Sheraton Univ. Club | Philadelphia, PA | 147.06 ✓ | | NB |
| 16 | 11/20/2003 - 12/20-03 | 24 | 12/8/2003 | Bohered Corp. | Detroit, MI | 97 | 1:28 a.m. ✓ | ✓ |
| | | 26 | 12/9/2003 | Bohered Corp. | Detroit, MI | 30 | 1:39 a.m. ✓ | ✓ |
| | | 19 | 12/7/2003 | Wheat & Rye Lounge | Romulus, MI | 18 | | ✓ |
| | | 20 | 12/8/2003 | Einstein Noah BGL 2 | Dearborn, MI | 15.01 | 12:17 p.m. | ✓ |
| | | 21 | 12/6/2003 | Marriott | Romulus, MI | 224.02 | 11:14 p.m. | ✓ |
| | | 22 | 12/8/2003 | Marriott | Pontiac, MI | 217.68 | 5:43 p.m. | ✓ |
| | | 23 | 12/8/2003 | Marriott | Pontiac, MI | 106.22 | 5:43 p.m. | ✓ |
| | | 25 | 12/10/2003 | Amoco | Romulus, MI | 8 | 1:21 p.m. | ✓ |
| | | 27 | 12/10/2003 | ExxonMobil | Harrisburg, PA | 12.97 | | ✓ |
| | | 28 | 12/10/2003 | Hertz | Detroit, MI | 197.53 | | ✓ |

DRAFT 3-7-05

**Paul G. Bedewi**
**GWU P-Card**
**Account #... 200869**

| Pkg. # | Stmt. Date | Transaction # | Transaction date | Vendor | Location | Amount | Time on receipt | Approval |
|---|---|---|---|---|---|---|---|---|
| 17 | 12/21/03 - 1/20/04 | 29 | 12/10/2003 | Jose Quervo Airport / Detroit Metro | Detroit, MI | 20.5 | | ✓ |
| | | 30 | 12/9/2003 | Marriott | Romulus, MI | 123.41 | 5:09 p.m. | ✓ |
| | | 31 | 12/9/2003 | Marriott | Romulus, MI | 112.86 | 5:09 p.m. | ✓ |
| | | 32 | 12/10/2003 | Speedway | Romulus, MI | 16.59 | 7:38 a.m. | ✓ |
| | | 33 | 12/10/2003 | Hertz | Harrisburg, PA | 86.58 | | ✓ |
| 18 | 1/21/04 - 2/20/04 | 13 | 1/7/2004 | Bohered Corp. | Detroit, MI | 96 | | NB |
| | | 14 | 2/6/2004 | Sweetwater Tavern | Sterling, VA | 218 | ✓ | NB |
| | | 21 | 2/12/2004 | ESI Group - North America | Bloomfield Hills, MI | 2000 | | ✓ |
| 19 | 2/21/04 - 3/20/04 | 28 | 2/14/2004 | ESI Group - North America | Bloomfield Hills, MI | 2000 | | NB |
| | | 1 | 2/20/2004 | ESI Group - North America | Bloomfield Hills, MI | 2000 | | ✓ |
| | | 6 | 3/24/2004 | Boca Raton Resort & Club | Boca Raton, FL | 1820.06 | | ✓ |
| | | 33 | 3/17/2004 | Koons Sterling Ford | Sterling, VA | 1418.44 | | ✓ |
| 20 | 3/21/04 - 4/20/04 | | | | | | | NB |
| | | 3 | 3/18/2004 | Sweetwater Tavern | Sterling, Florida | 65 | | |
| | | | | | | 3346.65 | | |
| | | | #4 - #13 | | | | | |
| 21 | 4/21/04 - 5/20/04 | 29 | 4/15/2004 | Beacon Hill Country Club | Leesburg, VA | 1677.57 | 1:55 p.m. | Cosentino |
| 22 | 5/21/04 - 6/9/04 | 12 | 5/26/2004 | Lansdowne Resort | Lansdowne, VA | 235 | 10:?? p.m. | Cosentino dinner for 10 for this amount |

*(handwritten)* 63294.47 ⟵ USG Total pre-Bedewi Review

*(handwritten)* DRAFT 3-7-05

4

**From:** Dennis Somech
**Sent:** Thursday, November 04, 2004 12:09 PM
**To:** Steve Tabackman
**Subject:** Bedewi..

FYI

I had a phone message from Paul yesterday asking for a status check. He said he'd left you one as well, so I'm guessing you spoke to him yesterday.

Today I talked to Griffiths, who wanted to let us know that he was a little behind on putting the plea agreement together (said the slowdown was due to press of business and the "loss" issue), but he would try to have something for us early next week.

_____

Dennis A. Somech, Esq.
Tighe Patton Armstrong Teasdale, PLLC
1747 Pennsylvania Ave., N.W.
Suite 300
Washington, D.C. 20006
Phone: (202) 454-2800
Fax:    (202) 454-2805

This electronic message contains information from the law firm of Tighe Patton Armstrong Teasedale, PLLC which may be confidential or privileged. The information is intended exclusively for the use of the individual or entity whose electronic mail address is named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us immediately at (202) 454-2800. Thank you.

Bedewi Disputed Restitution
May 9, 2005

| Pkg. # | Stmt. Date | Transaction # | Date | Vendor | Amount | Description | Allowable Charges |
|---|---|---|---|---|---|---|---|
| 3 | 9/21/02-10/21/02 | 11 | 10/13/2002 | AT&T Wireless | $ 186.46 | Cellular phone - utilized for NCAC business | $ 186.46 |
| | 10/22/02-11/20/02 | 3 | 10/20/2002 | Best Buy | $ 220.95 | $169.99 computer hardware for NCAC business | $ 169.99 |
| | | 15 | 10/20/2002 | Expedia | $ 5.00 | $52 for dinner - ESV Conference / Hyundai Visit- Airfare to Japan and Korea | $ 32.00 |
| | | 16 | 11/9/2002 | Bourbon St. Raw Bar | $ 64.00 | Stapp Conference/ISO Meetings | $ 64.00 |
| | | 17 | 11/9/2002 | Ruth Chris Steak House | $ 205.00 | Stapp Conference/ISO Meetings | $ 205.00 |
| 6 | 2/21/03-3/20/03 | 18 | 11/9/2002 | Sawgrass Marriott | $ 2,339.19 | Stapp Conference/ISO Meetings (NCAC & WSU) Meal for multiple GWU attendees | $ 2,130.60 |
| | | 11 | 3/5/2003 | LaShish | $ 85.00 | SAE Conference - Meeting at GM | $ 85.00 |
| | | 22 | 3/9/2003 | Best Buy | $ 1,034.95 | Computer hardware for NCAC business | $ 1,034.95 |
| | | 16 | 4/11/2003 | Expedia | $ 5.00 | ESV Conference / Hyundai Visit- Airfare to Japan and Korea | $ 5.00 |
| 10 | 5/21/03-6/20/03 | 17 | 4/11/2003 | Babies R Us | $ 894.43 | Child Safety Seat for Ford Program | $ 894.43 |
| | | 18 | 6/6/2003 | Maloney's Tavern | $ 240.34 | Child Safety Seat for Ford Program | $ 240.34 |
| | | 26 | 6/15/2003 | Marriott | $ 1,105.80 | Jessica Stapp travel to BMW | $ 1,105.80 |
| | | 27 | 6/15/2003 | Travelocity | $ 5.00 | Jessica Stapp travel to BMW | $ 5.00 |
| 11 | 6/21/03-7/20/03 | 27 | 7/1/2003 | Travelocity | $ 5.00 | Jessica Stapp travel to BMW | $ 5.00 |
| | | 6-13 | 7/7/2003 | Navigator of the Seas | $ 1,353.06 | Business center expenses of $55 were properly charged / Royal Caribbean mistakenly credited account for $1298.06 on 10/21-11/20 statement | $ 1,353.06 |
| 15 | 10/21/03-11/20/03 | 4 | 7/10/2003 | Courtyard Marriott | $ 541.97 | Child Safety Seat Training Class - Instructors (3) Hotel Rooms | $ 541.97 |
| | | 7 | 10/24/2003 | Hooters | $ 19.00 | Stapp Conference/ISO Meetings | $ 19.00 |
| | | 10 | 10/26/2003 | Hooters | $ 47.45 | Stapp Conference/ISO Meetings | $ 47.45 |
| | | 13 | 10/26/2003 | Hooters | $ 110.00 | Meeting with CHOP/UMTRI while at Stapp/ISO meetings (meals) | $ 110.00 |
| | | 14 | 10/27/2003 | Maloney's Tavern | $ 56.00 | Stapp Conference/ISO Meetings | $ 56.00 |
| | | 30 | 10/28/2003 | Hooters | $ 106.22 | Stapp Conference/ISO Meetings | $ 106.22 |
| | | 31 | 10/28/2003 | Hooters | $ 147.06 | Stapp Conference/ISO Meetings | $ 147.06 |
| 16 | 11/20/03-12/20/03 | 19 | 11/11/2003 | Sheraton Univ. Club | $ 147.06 | Hotel room while at CHOP in Philadelphia | $ 147.06 |
| | | 20 | 11/11/2003 | Sheraton Univ. Club | $ 8.00 | Hotel room while at CHOP in Philadelphia | $ 8.00 |
| | | 21 | 12/7/2003 | Wheat & Rye | $ 8.00 | Meetings for Ford project in Detroit / CHOP | $ 8.00 |
| | | 22 | 12/8/2003 | Einstein Bagel | $ 12.97 | Meetings for Ford project in Detroit / CHOP | $ 12.97 |
| | | 23 | 12/6/2003 | Detroit Airport | $ 197.53 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 197.53 |
| | | 24 | 12/6/2003 | Marriott | $ 15.01 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 15.01 |
| | | 25 | 12/9/2003 | Marriott | $ 224.00 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 224.00 |
| | | 27 | 12/9/2003 | Amoco | $ 217.88 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 217.88 |
| | | 28 | 12/10/2003 | ExxonMobil | $ 123.41 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 123.41 |
| | | 30 | 12/10/2003 | Hertz | $ 112.86 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 112.86 |
| | | 31 | 12/10/2003 | Hertz | $ 16.59 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 16.59 |
| | | 32 | 12/10/2003 | Speedway | $ 16.59 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 16.59 |
| | | 33 | 12/10/2003 | Hertz | $ 86.58 | Meetings for Ford project in Detroit / CHOP annual manufacturer's Meeting | $ 86.58 |
| | | 21 | 2/1/2004 | ESI Group | $ 2,000.00 | EASiMAD & EASiCrash Software License | $ 2,000.00 |
| | | 28 | 2/1/2004 | ESI Group | $ 2,000.00 | EASiMAD & EASiCrash Software License | $ 2,000.00 |
| 19 | 2/21/04-3/20/04 | 39 | 2/2/2004 | ESI Group | $ 2,000.00 | EASiMAD & EASiCrash Software License | $ 2,000.00 |
| | | 1 | 2/2/2004 | ESI Group | $ 1,820.00 | WLFRC Dissertation Defense/ITS Conference/APRC Annual Meeting | $ 1,820.00 |
| | | 6 | 3/24/2004 | Boca Raton Resort & Club | $ 3,346.65 | WLFRC Dissertation Defense/ITS Conference/APRC Annual Meeting | $ 3,346.65 |
| | | 4-13 | | Multiple Charges | | | |
| | | | | | | Total | $ 20,842.24 |
| | | | | | | USG Unallowed P-Card Charges | $ 63,294.47 |
| | | | | | | Actual Unallowed P-Card Charges | $ 42,452.23 |
| | | | | | | Total | $ 36,150.00 |
| | | | | | | Stiped Payments | |
| | | | | | | Total | $ 1,820.00 |
| | | | | | | Restitution | $ 80,000.00 |
| | | | | | | Total | $ 78,602.23 |
| | | | | | | Total Additional Payment Due | $ (1,397.77) |

Exhibit 9
United States v. Bedewi
Cr. No. 05-303-01



THE GEORGE
WASHINGTON
UNIVERSITY
W A S H I N G T O N   D C

VICE PRESIDENT AND GENERAL COUNSEL

July 13, 2006

Steven C. Tabackman, Esq.
Tighe, Patton, Armstrong, Teasdale, P.L.L.C.
1747 Pennsylvania Avenue, N.W., Suite 300
Washington, DC  20006

Re: Paul Bedewi

Dear Mr. Tabackman:

As you are aware from the victim impact statement The George Washington University recently submitted in connection with Paul Bedewi's upcoming sentencing, it is GW's position that your client never fully repaid GW for losses the University suffered as a result of the illegal acts of Paul Bedewi and/or his spouse. At a minimum, Mr. Bedewi still owes GW $18,738 for direct losses it incurred due to Mr. Bedewi's misuse of his GW issued P-Card, improper charging of his golf club membership fees to GW accounts and fraudulent stipend payments made to his wife. GW expects full repayment in the amount of $18,738, sent to my attention, within ten (10) business days from the date of this letter.

In addition to these direct losses, GW questions the "consulting fees" Mr. Bedewi received from the Motor Vehicle Fire Research Institute (MVFRI), a sponsor of GW research, while he was a full-time GW employee. Given his full-time commitment to GW, and assuming he was fulfilling that commitment, the University finds it implausible that Mr. Bedewi worked as many hours for MVFRI as he purported. According to invoices submitted by Mr. Bedewi, his outside duties consumed an average of approximately 92 hours/month. Yet, in contrast to those questionable invoices, Mr. Bedewi noted that it was "important for me to minimize my outside work load for consulting." GW contends the outside "consulting" arrangement was one part of his fraudulent scheme to meet his stated goal of increasing his annual income beyond what he was properly paid by the University. We can only surmise that he was cheating both GW and MVFRI in the process.

While GW did not seek restitution for the outside consulting fees through the criminal process, it appears that GW nevertheless suffered a loss of funding opportunities that should have properly flowed through the University and/or paid a full-time employee for less than full-time work. Consequently, GW requests detailed information about Mr. Bedewi's work for MVFRI, including the subject matter(s) and copies of reports, analyses, etc. he produced to MVFRI. In lieu of such detailed information, and in the interests of resolving all known matters between GW and your client now, GW will accept a payment of one-half of the MVFRI consulting fees that Mr. Bedewi received, meaning $104,040 in addition to the $18,378 identified above. This is a confidential settlement offer, and will only remain open for the same ten-day period.

Sincerely,

*[signature: William F. Howard]*

William F. Howard
Deputy General Counsel

Exhibit 10
United States v. Bedewi
Cr. No. 05-303-01

# TIGHE PATTON ARMSTRONG TEASDALE, PLLC

### ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
Third Floor
WASHINGTON, DC 20006-4604

—
TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com
—

STEVEN C. TABACKMAN
WRITER'S DIRECT DIAL: (202) 454-2811
EMAIL: stabackman@tighepatton.com

October 30, 2006

**<u>Hand-Delivered</u>**
William F. Howard, Esq.
Deputy General Counsel
2100 Pennsylvania Avenue, NW
Suite 250
Washington, DC 20052

Re: Paul Bedewi

Dear Mr. Howard:

This letter responds to yours of July 13, 2006. Initially, let me express my regret for the time that has passed in getting you a response; for the most part, it was occasioned by circumstances outside the control of both myself and Mr. Bedewi. It is worth noting, however, that the timing of your current demand is curious, if not suspicious; moreover, that timing makes any delay in responding to the insupportable demands contained in your letter pale by comparison. I refer to the fact that George Washington University ("GW") allowed nearly two years to pass since receiving from Mr. Bedewi a payment of Eighty-Thousand Dollars ($80,000.00) before asserting that Mr. Bedewi owes additional money.

You will no doubt recall that within 48 hours of GW's accountants and lawyers confronting him with evidence of his wrongdoing, Mr. Bedewi acknowledged his obligation to reimburse GW for unauthorized "P-Card" expenditures and a stipend GW had given his wife. Mr. Bedewi made the referenced payment within weeks of his acknowledgment after securing the necessary funds through an additional mortgage on his home. All this occurred many months before GW made its referral of Mr. Bedewi's to the United States Attorney for the District of Columbia.

I mention these circumstances because your letter's arrival, asserting claims in excess of $225,000 and expressing GW's willingness to settle these claims in consideration of Mr. Bedewi's paying $122,418 "within ten (10) business days," pre-dated Mr. Bedewi's then-scheduled sentencing date (August 24, 2006) by approximately five weeks. Your correspondence since that date has emphasized the need to resolve this issue before sentencing takes place. It is clear that GW has chosen to bank on the pendency of the sentencing to exert pressure on Mr. Bedewi and to overcome the absence of support for either of these current claims.

Exhibit 11
United States v. Bedewi
Cr. No. 05-303-01

William Howard, Esq.
October 30, 2006
Page 2

Indeed, as we both know, GW's demand for $208,000 that Mr. Bedewi lawfully earned from the Motor Vehicle Fire Research Institute ("MVFRI") *is for money in which GW does not have and never has had any legitimate interest.* I emphasize this because so as to highlight the falsity of the representation made to the United States District Court for the District of Columbia that the source of the $208,000 that Mr. Bedewi received from the MVFRI was through a "grant" that the MVFRI gave to GW. *See Victim Impact Statement("VIS")* at 2 ("Mr. Bedewi received $208,000 in additional consulting fees *from another GW grant,* the Motor Vehicle Fire Research Institute Project.")(Emphasis supplied.)). I cannot imagine your outside counsel, who signed the *VIS,* would have submitted this demonstrably false statement to a federal court but for someone at GW advising her that it was true.

### George Washington's Demand for Additional Payment for P-Card Expenditures

Furthermore, the other element in the current demand – a payment of $18,738, for allegedly unauthorized P-Card charges supposedly not covered by the payment two years ago – comes more than a year after the United States Attorney's Office ("USAO") forwarded to me a comprehensive list of Mr. Bedewi's allegedly improper P-Card expenditures. That list did not contain most of the expenditures which now, more than a year later, appear in the *VIS* that GW has recently submitted to the United States District Court through the Probation Office.[*]

This discrepancy surprises me. I understood that the USAO and the investigators in this case relied on information provided by GW in constructing the list of allegedly fraudulent expenditures that was sent to me on March 7, 2005. I cannot imagine the list being compiled without GW's input; the investigators had no other source from which to obtain the necessary information. Accordingly, I am skeptical that the charges for dinners and entertainment which appear in the *VIS* have not already been paid.

I also would be skeptical were GW to suggest that the items appearing in the *VIS* were discovered only after the government provided its proposed list of charges to me in March 2005; after all, by this date, auditors from Beers & Cutler and attorneys from Hogan & Hartson had been investigating this matter for approximately a year. Mr. Bedewi, working alone, arrived at the list that provided the basis for his $80,000 payment in two days.

GW was no doubt aware that the government was preparing its case against Mr. Bedewi; GW was contemporaneously busy preparing its own submission to the government regarding the scope of the damage sustained by governmental and other interests. Inclusion of an item in the list being prepared for Mr. Bedewi's criminal case surely provided an incentive for GW to be thorough so that GW's reimbursement to the government could be recouped from Mr. Bedewi, if possible. Moreover, GW could have achieved this presumably beneficial result without it having to pay for a separate review. All of this suggests that items not appearing on the list I received from the government were, in the opinion of either GW or the government, deemed inappropriate for reimbursement because of the nature of the expenditure and the purposes to be served by the list; or had already been covered by Mr. Bedewi's $80,000 payment in 2004.

---

[*] I understand the *VIS* to be the reference document for ascertaining the separate line items that together constitute the current claim.

William Howard, Esq.
October 30, 2006
Page 3

But even assuming – solely for the sake of argument – that GW was unable to give the government complete information in March 2005 (and I cannot fathom how this could be ), I did not provide our response to the proposed list until May 2005.  Furthermore, Mr. Bedewi's Plea Agreement was not executed until August 2005.  During these months, the investigators reviewed Mr. Bedewi's comments on the proposed list and satisfied themselves that the loss amount was both accurate and complete, with particular emphasis on ensuring that it included all items for which Mr. Bedewi was legitimately responsible. The accuracy of this amount was essential to determining not only restitution but also the length of Mr. Bedewi's sentence. You no doubt can appreciate that in circumstances such as those confronting Mr. Bedewi, the prosecutor has the upper hand in determining whether an item will be included in the list of unauthorized expenditures upon which both "loss amount" under the Sentencing Guidelines and restitution amount would be based..

I would be surprised to learn that GW was not consulted during the five months that the parties were engaged in this process.  In any event, GW knew that the parties were working toward a plea agreement with an agreed-upon loss figure.[†]  Yet, even with this additional time available to bring legitimate claims to the attention of the prosecutor and investigators, GW somehow failed to come forward with the claims for which it now demands payment on the eve of Mr. Bedewi's sentencing.  Under these circumstances, it is hardly surprising that GW – having already submitted these claims to the Court in the *VIS* – would now seek to settle these claims in advance of sentencing, effectively circumventing the Court's established procedures and avoiding the Court's review.

Mr. Bedewi rejects your belated assertion of these additional claims will not join in this effort to interfere with he Court's evaluation of them as part of the sentencing process.  As you know, when Mr. Bedewi made his payment of $80,000 in 2004, he expressly stated that he would consider any additional restitution claims that GW might make.  We extended this offer even though we believed that our own review of his P-Card expenditures was comprehensive; we included every expenditure that was even potentially subject to challenge as an "unauthorized use" of the P-Card because the goods or services purchased had no business purpose or otherwise evinced a wrongful intent to mislead GW as to the purpose of the expenditure.  Solely for ease of reference, I will refer to this state-of-mind as a "fraudulent intent".

After reviewing  the *VIS* list of items for which GW seeks additional payment from Mr. Bedewi, I have concluded that the items in that list reflect expenditures that have either (a) been reimbursed by Mr. Bedewi's $80,000 payment; or (b) are not properly subject to reimbursement through restitution because they are not really "fraudulent intent" expenditures properly subject to restitution in a criminal case.  Most of the items that make up this current demand are of the second type, *e.g.*, the purchase of computer equipment that GW has in its inventory but which it now wants Mr. Bedewi to pay for (while GW presumably gets to keep the hardware); his supposed failure to use the least expensive telephone service; his purchase of supplies that went

---

[†] I recall seeing representatives of GW were present in the courtroom on October 24, 2005, when Mr. Bedewi entered his plea; indeed, I spoke with Barbara Van Gelder, GW's outside counsel, either just before or just after  the plea hearing.

William Howard, Esq.
October 30, 2006
Page 4

into GW's inventory. GW's current list of expenditures appears to reflect an effort at recouping from Mr. Bedewi *legitimate* expenditures for the operation of the NCAC.

Even if I were to assume that federal contract auditors (or perhaps GW's own auditors) have challenged these expenditures as excessive, they are not recoverable in a criminal case absent proof that they were evidence some fraudulent activity by Mr. Bedewi or that he improperly diverted an item for his personal use. GW's demand for payment with respect to these legitimate expenditures (such as the computer) is not an effort to be made whole; rather, it is a cynical attempt to use the occasion of Mr. Bedewi's sentencing to unjustly enrich itself.

But setting aside these legitimate expenditures that bear no indicia of the type of activity addressed in this criminal prosecution, there remains the question of GW's timing in asserting additional claims that, as characterized in the *VIS*, arguably reflect misuse of the P-Card in a manner that is facially similar to expenditures that are included in the loss amount as stated in the Plea Agreement. As noted, it appears to me that these expenditures actually have been reimbursed in Mr. Bedewi's $80,000 payment, which exceeds the actual loss amount calculated by federal authorities.

But even if there remain some expenditures that have not been reimbursed, I suggest that their omission is a result of GW's calculated decision not to have them included in the list compiled prior to entry into the plea agreement. I suggest that GW waited to assert these claims in the *VIS* – long after the GW knew of these expenditures and long after Mr. Bedewi and the government calculated the loss amount for purposes of sentencing and restitution – without an expectation that it would actually obtain "restitution" through the criminal sentencing process.

Rather, GW's failure to inform federal authorities of these supposed "losses" a year ago was motivated by its desire to deprive Mr. Bedewi of whatever benefit GW thought he might otherwise derive from the prompt restitution he made immediately upon GW's confronting him with his wrongful behavior. Simply put, even if one assumes (solely for the sake of argument) that there are some *de minimis* expenditures for which GW has not been reimbursed, and we do not believe there is, they exist solely because GW consciously withheld these items when it was providing its losses to federal authorities 18 months ago so that it could have a basis to dispute the strongest argument that Mr. Bedewi has for mitigation of his sentence, *viz.*, his prompt and complete restitution long before the criminal case was even on the horizon.

There really is no other reasonable explanation for the absence of these alleged personal expenditures from the list of items on the spreadsheet I received from the prosecution on March 7, 2005. As I have said, it is inconceivable that the numerous auditors and attorneys poring over GW's books for nearly a year had not discovered these expenditures by then (or by August 2005, when the Plea Agreement was signed). GW (or its experience outside counsel) knew that not including these items in the painstakingly calculated loss amount would make it less likely that GW would receive restitution. On the other hand, creating the (false) impression at sentencing that Mr. Bedewi still has an unsatisfied obligation to GW has the potential for a disproportionate negative impact on elements of his sentence other than restitution.

At least three other considerations support my hypothesis. First, is the instant letter, which seeks to circumvent the criminal restitution process by demanding payment before the Court

William Howard, Esq.
October 30, 2006
Page 5

would have an opportunity to consider the claims contained in the *VIS*. Coming on the heels of the *VIS* submission, your letter confirms my belief that GW does not expect the Court to include these belated and substantively insupportable P-Card items in its restitution order. Were this not the case, GW would simply allow the matter to be resolved through the sentencing process rather than make this separate demand.

Second, the narrative portion of the *VIS* shows that GW is not seeking to be made whole for losses occasioned by Mr. Bedewi or to see him receive a punishment that is proportionate to the crime he committed. Thus, GW claims that "while Paul Bedewi's conduct did not result in the massive losses that his cousin's actions caused, the defendant's transgressions are as, if not even more, egregious because they were motivated by pure greed and materialism." *VIS* at 2. The suggestion that Mr. Bedewi's use of his P-Card resulting in a loss to GW of less than $50,000 (which he promptly reimbursed when confronted) is "as, if not even more, egregious" than Nabih Bedewi's complex fraudulent transactions involving, *inter alia*, the creation of fraudulent transactions with companies set up solely for that purpose, which resulted in a loss of nearly $1 million, shows that GW desire for vengeance has caused it to lose all perspective. This is further borne out by the effort to make Paul Bedewi equally responsible with his older cousin for the temporary suspension of the Cooperative Agreement and the need to repay $1.85 million "in unallowable costs and penalties". *Id.* at 3. Given the agreement by the federal government that Paul Bedewi caused less than $80,000 in losses, I would suggest that it is disingenuous (at best) for GW to suggest that Paul Bedewi bears responsibility for the magnitude of GW's payment to the government. In addition, you seek to have the Court impose "a maximum sentence" (*id.*), effectively asking the Court to ignore Mr. Bedewi's prompt reimbursement of the entirety of the losses he caused long before GW even made its referral to the U.S. Attorney's Office.

Finally, your demand, on the eve of sentencing, that Mr. Bedewi pay GW $104,000 to settle other claims unrelated to the P-Card, despite the absence of any legally cognizable interest in that money; and the concomitant *false and fraudulent statement to the United States District Court* that "Mr. Bedewi received $208,000 in additional consulting fees *from another GW grant*, the Motor Vehicle Fire Research Institute Project," (*VIS* at 2) demonstrate the lengths to which GW is willing to go to obtain money even if it does not now, and never has, belonged to GW. Moreover, by inserting Mr. Bedewi's payments that *he received directly from the MVFRI* into the sentencing process and falsely telling the Court that the money came "from another GW grant," GW has demonstrated that truth is no constraint in its efforts to manipulate Mr. Bedewi and the Court's lawful processes. I discuss this more fully below.

But regardless of your expectations (or my assessment of them), the proximity of this letter to the upcoming sentencing can hardly be a mere coincidence. Your initial condition that GW receive payment within ten days of your letter; your continued insistence that this matter be resolved prior to the sentencing date; your demand that Mr. Bedewi also pay GW a much larger sum of money which he received from a third-party (MVFRI) for work he did as an independent contractor; and your effort to keep this latter demand secret from the Court and the USAO all point to GW's using the pending sentencing as a pressure-point in the hope that it can acquire outside of court what it almost certainly will not receive from the Court. Mr. Bedewi will not play along with this cynical and malevolent scheme  Mr. Bedewi will make no additional

William Howard, Esq.
October 30, 2006
Page 6

payment with respect to his use of the P-Card because his payment of $80,000 exceeds his legitimate obligation to GW as calculated by him and concurred in by federal investigators.

### George Washington's Demand that Mr. Bedewi Hand Over the Legitimate Compensation Received Directly from the MVFRI for Work He Performed as an Independent Contractor

Mr. Bedewi also rejects your separate demand for an immediate "settlement" payment of $104,040, a claim that is based solely upon your self-serving "surmise" (your word; "speculation" would be a much better choice) that "it *appears* that GW . . . suffered a *loss of funding opportunities that should have properly flowed through the University* and/or paid a full-time employee for less than full-time work." (Emphasis supplied.) The most succinct response that can be made to this preposterous assertion is that your imagination and speculation are not, last I checked, grounds for recovery in any court I am aware of.

More importantly, however, GW's efforts to manipulate the District Court's sentencing process to pressure Mr. Bedewi into acceding to the demand in your letter has led GW to make a blatantly false statement in the *VIS*, specifically, that "Mr. Bedewi received $208,000 in additional consulting fees *from another GW grant*, the Motor Vehicle Fire Research Institute Project." (*VIS* at 2) (Emphasis supplied.) In addition, GW implicitly misleads the District Court regarding its unadorned statement that it is "not asking for restitution for any of these funds . . . ," (*id.*), as if GW could legitimately do so if it wanted to.

The reason GW does not ask for "restitution" is that GW knows that the funds at issue were not GW's in the first place. This sum of money was paid to Mr. Bedewi directly by the MVFRI for work that he did under a contract to which GW was not a party and in which it has no interest. Although your letter essentially acknowledges that the money you want Mr. Bedewi to hand over was never GW's, the *VIS* states precisely the opposite. I of course have no way of knowing why, having made one false statement to the District Court, the author(s) of the *VIS* decided to stop there. I suspect that someone calculated that Mr. Bedewi was sufficiently damaged by the spurious claim that he took this large sum of money from GW and that GW could create the (false) impression of moderation by not asking the Court to order "restitution" of money that was never GW's in the first place.

But this second more subtle "deception by omission" leads to a third deception on the Court and to employment of a highly questionable tactic with respect to Mr. Bedewi. There is little doubt that GW intended for the Court to conclude that, for whatever reason, GW was simply forgoing an opportunity to recoup money it claimed Mr. Bedewi wrongfully obtained "from another GW grant." But as we know, that conclusion would be incorrect. Within days after filing the false and deceptive *VIS*, you sent me your letter seeking the precisely the same amount of money that the *VIS* implied was not being sought. Moreover, your letter offers to compromise your baseless claim and seeks to keep the entire scenario secret from the Court and the prosecutor by characterizing the letter as a "confidential

As noted, the letter does not include the false assertion that the money came "from another GW grant." Rather, it spins the self-serving theory that GW "suffered a loss of funding opportunities that should have properly flowed through the University . . . ." But surely, had you believed when you wrote the letter that this money came "from another GW grant," you would

William Howard, Esq.
October 30, 2006
Page 7

have said so.  Which raises the following questions: When did GW learn that the money Mr. Bedewi received from MVFRI was not "from another GW grant? The VIS is dated July 7, 2006; your letter is dated July 13, 2006.  Did GW first learn between these two dates that there was no "GW grant" involved in  the money that Mr. Bedewi received from MVFRI?  If so, why didn't GW undertake to correct its false statement to the District Court?  If GW knew this before July 7, 2006, doesn't that make the statement in the VIS knowingly false?  Was the false depiction of the MVFRI money in the *VIS* an effort to use the sentencing process to pressure Mr. Bedewi into paying you money that you had no chance of obtaining because it wasn't GW's in the first place?  These are questions the Court and the prosecutor might well want to pursue.

   As for the claim you assert, were GW to bring such a claim in either D.C. Superior Court or the United States District Court predicated on the theory set out in the portion of your letter I have quoted, Mr. Bedewi would move immediately for sanctions under *Fed. R. Civ. P.* 11 or its analog in Superior Court.  In the meantime, we are assessing whether GW's effort to use the Court's potential reaction to a false representation in a sentencing submission of a $208,000 claim to pressure a defendant to compromise that claim out of court violates local or federal criminal statutes,  There is also the serious question whether D.C. Rules of Professional Conduct D.C. 3.3(a) and 8.4 have been violated by the manner in which attorneys created this situation..

   GW suffered no "loss of funding opportunities" as a result of Mr. Bedewi's work for MVFRI.  My investigation has discovered that during the relevant timeframe GW received in excess of $340,000 from MVFRI, which was the most that MVFRI gave to any institution.  This money was *not,* however, the source of Mr. Bedewi's payments from MVFRI.  During this same period, NCAC faculty, *e.g.*, Mr. Eskandarian, proposed additional projects to MVFRI, all of which were rejected, at least in part because GW was already receiving more than any other institution and MVFRI simply wanted to spread its grants.  These facts – all of which you must have been aware of at the time you forwarded your demand for payment – belie the validity of GW's assertions.  But it must be emphasized that Mr. Bedewi's separate work had nothing whatsoever to do with whether GW received additional grants.

   In performing his work for MVFRI, Mr. Bedewi was an independent contractor hired directly by MVFRI's Board of Directors; payments made to him by MVFRI were entirely unrelated to research funds that MVFRI provided to GW.  Dr. Ken Digges, the principal investigator on the MVFRI project (which was funded by a settlement of a class action against GM), chose Mr. Bedewi and supervised his performance.  A reasonable person might infer from Dr. Digges's authorization of payments to Mr. Bedewi and reliance on him even after Mr. Bedewi's unrelated NCAC conduct came to light that Dr. Digges was entirely satisfied with Mr. Bedewi's performance of his MVFRI work.

   To sum up: Unless I am incorrect in my understanding of the relevant circumstances and relationships, you, on behalf of GW, have asserted that Mr. Bedewi should pay to GW money that he received from a third-party for work that he performed to the evident satisfaction of that third-party based on your "surmise" that he did not do the work he said he did.  Unless GW has become MVFRI's agent, I cannot find any legal basis for GW to make such a demand.  Has MVFRI granted to GW the authority to speak for it on this issue? Has MVFRI advised you that it wants a refund of the money it paid Mr. Bedewi?  Is MVFRI even aware that GW is asserting a

William Howard, Esq.
October 30, 2006
Page 8

claim to money that was never GW's in the first place? Does GW have any evidence to support its self-serving assertion that MVFRI would have hired someone from GW had Dr. Digges not chosen Mr. Bedewi? And how does the possibility of MVFRI's hiring a different independent contractor cause GW "to suffer loss of funding opportunities that should have properly flowed through the University"?

Nor do you have any factual basis to support the second speculation in your equation: That Mr. Bedewi *could not have* satisfied his 40 hours per week obligation as a full-time GW employee *and* still have worked 92 hours per month (on average; which is approximately 23 hours per week) for MVFRI. That "the University *finds it implausible* that Mr. Bedewi worked as many hours for MVFRI as he purported," is of no consequence. I trust that it will come as no surprise that the University's self-serving opinion on such matters has yet to be enshrined as the standard by which the validity of its claim will be judged.

But of far greater importance, this assertion of implausibility is belied by a huge body of easily accessible, naturally occurring empirical data. Although the University may find it "implausible" that professionals work 60-65 hours per week at their jobs, I assure you that it is (perhaps unfortunately) a commonplace occurrence in the District of Columbia metropolitan area and elsewhere. It is particularly common among persons such as Mr. Bedewi, whose well-documented lifelong record of extraordinary achievements is marred only by his unfortunate failure to reject his cousin's poisonous philosophy self-entitlement and the equally poisonous environment the latter managed to create at your institution. (From all indications, however, this attitude seems to flourish at the institutional level even in his absence).

The reasons that Mr. Bedewi will not accede to this unfounded demand for money are the same reasons that he will neither provide you with the information that you have demanded nor otherwise participate in a procedure whereby GW – having already announced that Mr. Bedewi is a liar – gets to decide whether it wants to change its mind (which would necessitate withdrawal of its demand that it be paid more than $208,000.) For some reason, I think this change-of-heart is not likely to take place. Although I am confident that the MVFRI materials won't change the absence of evidentiary support for your claim, I am similarly confident that they will not change your decision to pursue it, if that is GW's intention. Equally important, however, GW has no more right to view reports that Mr. Bedewi prepared for MVFRI than it does to obtain the money that MVFRI paid him for preparing them.

Furthermore, unless the process for ascertaining the validity of allegations such as GW's has changed while I wasn't looking, GW has the burden of proving the truth of its assertions with respect to Mr. Bedewi's work performance. I see no reason to take that burden from you. For the record, and so that there is no misunderstanding (or opening for you to mischaracterize) Mr. Bedewi's reasons for declining your offer, I will state that Mr. Bedewi did not cheat either MVFRI or GW. If GW has *evidence* to the contrary, please produce it and we will address it as we deem necessary and proper.

Short of that, Mr. Bedewi has neither interest in engaging in the quixotic undertaking of convincing GW that he did not cheat either GW or MVFRI. One need only read the VIS to appreciate why I chose this characterization. That document as well as other correspondence and oral statements from you and your staff compel the conclusion that there is no quantum of

William Howard, Esq.
October 30, 2006
Page 9

evidence that could satiate GW's speculative appetite or dissuade it from its pre-ordained conclusions. To place GW in the role of arbiter regarding Mr. Bedewi's work capacity is to create a "heads you win, tails we lose" process: If we produced a multitude well-crafted MVFRI reports, you'd claim that Mr. Bedewi must have given GW less than a full week's work; few reports and you would claim that he cheated MVFRI.

There are two other points that I want to make, both of which are occasioned by your characterization of your correspondence as "confidential". First, GW has made a claim *in a criminal matter* for an additional $18,738. It has also falsely informed the Court that Mr. Bedewi wrongfully took an additional $208,000 "from another GW grant" but that you are not seeking "restitution". Without knowledge of the facts (particularly the false statement regarding the source of Mr. Bedewi's MVFRI compensation), the Court might be misled into crediting GW's positions. Indeed, the appearance created by GW's apparent decision to push for restitution of the MVFRI money might even serve to enhance GW's position on other matters covered in the *VIS*. I am obliged, both on behalf of Mr. Bedewi and as an officer of the Court, to ensure that GW's efforts to mislead the Court are fully disclosed.

Second, given the absence of any evidence to support either demand; and, with respect to Mr. Bedewi's legitimate payments from the MVFRI, the lack of any legal basis as well, it is my view that GW's asserting these demands outside the sentencing process after raising them in the *VIS*, is, at least ethically if not criminally, indistinguishable from conduct that could be prosecuted as obstruction of justice if initiated by Mr. Bedewi. Neither Mr. Bedewi nor I will participate in a scheme of this sort. As previously stated, both the Court and the prosecutor are entitled to know of GW's attempt to manipulate, if not subvert, the Court's lawful processes. Accordingly, I have copied both AUSA John Griffith and U.S. Probation Officer Monica Johnson on this correspondence.

Sincerely,

Steven C. Tabackman

Cc: AUSA John Griffith (with copy of letter from Howard)
    USPO Monica Johnson (with copy of letter from Howard)

# Reimbursement Form



**NCAC** NATIONAL CRASH ANALYSIS CENTER

**Purpose:** **Supplies for project reports / NCAC business meals**

## Information

| Name | **Paul Bedewi** |
|---|---|
| SSN | **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** |
| Address | **20946 Cohasset Terrace** |
| | **Ashburn, VA 20147** |

| Date | Company | Description | Amount |
|---|---|---|---|
| 12-Jul-02 | Staples | Office supplies | ✓ 92.60 |
| 26-Jun-02 | Lansdowne Grill | Lunch | $60.00 |
| 24-Jul-02 | Boston Market | Lunch | $53.77 |
| 31-Jul-02 | Rite Aid | Video tapes for FOIL event | 8.99 |
| 25-Jul-02 | That's Amore | Dinner | $242.25 |
| 1-Aug-02 | Madhatter Grill | Dinner | $125.00 |
| 9-Aug-02 | Staples | Office supplies | 23.50 |
| 21-Aug-02 | Mathews Tire & Auto | Tires | $44.52 |
| 21-Aug-02 | Mathews Tire & Auto | Oil/Filter | $15.44 |
| | | | |
| | | **TOTAL** | 666.07 |

**Approved**    **Project / Task / Award**

8/28/02

21737 - 2 - C C N 501259

Exhibit 12
United States v. Bedewi
Cr. No. 05-303-01

8/1/02 DINNER - FOIL EVENT
$125.00

PAUL BEDEWI
BUD ZAOUK
TONY ALANI
SARAH KIRKISH - FORD
BILL KING - FORD

Business PURPOSE:
REVIEW RESEARCH
PROGRESS ON NHTSA
VEHICLE MODELING &
FHWA TESTING
PROGRESS AT
FOIL

**MADHATTER**

Date: 8/1/02    Time: 12:48:57 AM

Status:              APPROVED

Card Type:        Master Card
Card Number:    5410654511946219
Expiration Date: 12/31/03
Swipe/Manual:   Swipe

Server ID:            10
Server Name:       SCOTT
Check Number:     118717
Check Name:      Bedemi

Tab Number:       16608
Profit Center ID: 2
Profit Center:     Up Bar Sales
Number Of Covers: 1
Persons:             1
Card Owner:       BEDEWI/PAUL

AMOUNT    108.35

TIP          16.65

TOTAL      125.00

Approval: 895290

I AGREE TO COMPLY WITH
THE CARDHOLDER AGREEMENT

x _Paul Bedewi_
Customer Signature

THAT'S AMORE
STERLING
000903214830994      02
                APPROVAL CODE
JUL 25, 02             888752

PAUL BEDEWI
5410654511946219
M.C.                      03/12

    SALE               0019
ROC #                TERMINAL #
418272              50039250

    FOOD AND BEVERAGE

BASE AMOUNT         $203.25
TIP AMOUNT           $39.00
TOTAL               $242.25

_Paul Bedewi_
I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF CREDIT VOUCHER)
TOP COPY-MERCHANT    BOTTOM COPY-CUSTOMER

7/25/02 DINNER

PAUL BEDEWI )
BUD ZAOUK   ) GWU
KEN DIGGES )
JOAN CLAYBROOK )
CLARENCE DITLOW )

      MUFRI
BUSINESS PURPOSE
REVIEW STATUS
OF testing
capability AT
FHWA - FOIL
DISCUSS UPCOMING
TEST PROGRAM
AT FHWA

**STAPLES 365 SAVINGS**

Low prices. Every item. Every day.
We 110% Price Match Guarantee It.

21060 Southbank St.
Sterling, VA 21065
(703) 406-3270

SALE                    225338 10 001 4125
                        0819 08/09/02 12:2

QTY SKU                      OUR PRIC

1   READY INDEX 1-5 TA
    072782111311                 1.78
1   READY INDEX 1-5 TA
    072782111311                 1.78
1   READY INDEX 1-5 TA
    072782111311                 1.78
1   READY INDEX 1-5 TA
    072782111311                 1.78
1   STAPLES VIEW BINDE
    073333169652                 8.19
1   STAPLES VIEW BINDE
    073333169652                 8.19
    SUBTOTAL                    23.50
    Standard Tax 4.50%           1.06
TOTAL                         $24.56

MasterCard                     24.56

Card No.: XXXXXXXXXXXX6219 <S>
Expiration Date: 12/03
Auth No.: 205681

# RITE AID

It's not just a store. It's a solution

INTERNET REFILLS
www.RiteAid.com
Powered by drugstore.com

Store #03723
112 CHAIN BRIDGE
McLean, VA  22101
(703) 356-5824

Register #4 Transaction #306564
Cashier #37235466  7/31/02 10:17AM

1 MAXELL 8MM VIDEO TAPE 2PK  8.99 T

1 Items      Subtotal        8.99
             Tax              .40
             Total           9.39
CASH  PAYMENT                20.00
             Tendered        20.00
             Cash Change     10.61

---

Low prices. Every item. Every day.
We 110% Price Match Guarantee It.

21060 Southbank St.
Sterling, VA 21065
(703) 406-3270

SALE                    642090 14 001 3297
                        0819 07/12/02 01:5

QTY SKU                      OUR PRIC

    *****Buy More / Save More*****
    HEAVY DUTY VIEW BI
    073333797046                14.39
    HEAVY DUTY VIEW BI
    073333797046                14.39
    HEAVY DUTY VIEW BI
    073333797046                14.39
    Discount Amount <-4.80>
    CD PAGE 2PK
    077711752573                 3.59
    CD PAGE 2PK
    077711752573                 3.59
    CD PAGE 2PK
    077711752573                 3.59
    CD PAGE 2PK
    077711752573                 3.59
    CD PAGE 2PK
    077711752573                 3.59
    CD PAGE 2PK
    077711752573                 3.59
    LASER CD/DVD WHITE
    072782056926                14.75
    AVERY XTRAWIDE DIV
    072782111656                 4.38
    AVERY XTRAWIDE DIV
    072782111656                 4.38
    AVERY XTRAWIDE DIV
    072782111656                 4.38
    SUBTOTAL                    92.60
    Standard Tax 4.50%           4.17
TOTAL                         $96.77

MasterCard                     96.77

Card No.: XXXXXXXXXXXX6219 <S>
Expiration Date: 12/03

LANSDOWNE GRILLE
Lansdowne Resort
(703) 729-8400
44050 Woodridge Parkway
Leesburg, Virginia 20176
www.lansdowneresort.com
CHECK:        2936
TABLE:        35/1
SERVER:       509 AIMEE R

CARD TYPE:  MasterCard
CCT #:      5410654511946219
XP DATE:    12/03
UTH CODE:   81
        PAUL BEDEWI

UBTOTAL:         46.89

ratuity        Total 60⁰⁰

uest Signature

SECOND COPY FOR GUEST RECORD

[ agree to pay the above total
  amount according to the
  card holder agreement

LUNCH 6/26/02
FORD VISIT TO NCAC

PAUL BEDEWI  ⎫
BUD ZAOUK    ⎬ GWU
STEVE KAN    ⎭

SARAH KIRKISH ⎫ FORD
BILL KING     ⎭

BUSINESS PURPOSE:
Demonstrate Progress
on NHTSA Vehicle
Modeling. Discuss
Assistance from
Ford for providing
data to support
NHTSA contract

Boston Market
2002-07-24              11:31 AM
        0536 2 6 2010

Chicken for 3           15.99
  Mashed Pot Ls
  Dill New Pots Ls
  Cinn Apples Ls
Chicken for 6           29.49
  Steamed Veg Ls
  Stuffing Ls
  Sweet Potato Ls
  Spinach Ls
  Rice Pilaf Ls
  Mac & Chz Ls
  2 Liter Bottle         1.99
  2 Liter Bottle         1.99
  2 Liter Bottle         1.99

Take Out        51.45
4.50 % Tax       2.32
  mount Due     53.77

Credit Card     53.77
Amount Tendered   .00

LUNCH 7/24/02

PAUL BEDEWI      ⎫
BRAD LEIER       ⎪
HAMED SOLTANI    ⎬ GWU
AMIR HEDAYATI    ⎪
JEAN-YVES BUREL  ⎪
DAN GODRICK      ⎭

BUSINESS PURPOSE:
REVIEW STUDENT
PROGRESS ON
VEHICLE MODELING
FOR NHTSA
and FHWA
REQUIREMENT

# MATTHEWS TIRE & AUTO SERVICE

703 SOUTH MAPLE STREET
MARYSVILLE, OH 43040
(937)642-2881

**GOODYEAR**

ESTIMATE                                                    08/21/02
025191                                                      11:48 AM
                                                            TERR: 1678
AGE: 01                                              NONSIG: 184731

**ESTIMATE/WORK ORDER-DO NOT PAY**

BILL TO: PAUL BEDEWI
         20946 COHASSET
         ASHBURN, VA 20147

PHONE 1...... (   )   -              VEH YEAR/MAKE. _____
PHONE 2...... (   )   -              VEHICLE MODEL. _____
DATE REQUESTED 08/21/02              VEHICLE COLOR. _____
TIME REQUESTED ___ AM/PM             LICENSE/STATE. _____
RETURN PARTS.. NO                    ODOMETR IN/OUT _____
SALESMAN...... 005 / 005             VEHICLE INFO.. _____
PRIOR INVOICE. 025190

ACOUNT # COB TC CUST#
800001 2 01 07012

INSTRUCTIONS.... _____

| X | TECH | PRODUCT CODE | BC | QTY | DESCRIPTION | PARTS | LBR/EXCISE | LINE TOTAL |
|---|------|-------------|-----|-----|-------------|-------|------------|------------|
| --- | --- | 040-200 | R | 6 | OIL CARRY OUT | 2.00 | .00 | 12.00 |
| | | 040-200 | R | 1 | OIL FILTER CARRY OUT | 2.00 | .00 | 2.00 |
| --- | | 046-788 | R | 1 | SERVICE SUPPLIES | .56 | .00 | .56 |

*Oil /filter for
MURI Test Car
To BE USED
AT FHWA-FOIL
FOR TESTING*

WE PROVIDE YOU A WRITTEN ESTIMATE FOR ALL SERVICE OR REPAIRS OVER $25.00.
WE WILL NOT EXCEED THE ESTIMATE WITHOUT CONTACTING YOU FOR APPROVAL.
TO KEEP YOUR FINAL BILL DOWN, SOME PARTS MAY BE RETURNED TO THE MANUFACTURER.
BUT ALL PARTS WILL BE NEW UNLESS OTHERWISE SPECIFIED.

*Paul Bedewi*

                                          SALES TAX                0.88
CUSTOMER AUTHORIZATION TO PROCEED WITH REPAIRS  **ESTIMATE TOTAL**    $15.44

REGISTRATION.. QTY ___ / ID _____    QTY ___ / ID _____    QTY ___ / ID _____    QTY ___ / ID _____

 SPEC R/U. _____       BALL SPEC R/U. _____       BALL SPEC L/U. _____       BALL SPEC L/L. _____
 ACTL R/U. _____       BALL ACTL R/U. _____       BALL ACTL L/U. _____       BALL ACTL L/L. _____

IOR    BY. _____       AUTH REC'D BY. _____       MANNER REC'D.. _____
 PHONE.. _____         AUTH DATE.... ___/___/___    AUTH TIME.... _____ AM/PM
USED TOTAL. _____      ADD'L AMOUNT. _____        REPAIRS DESC.. _____

**HAVE A QUESTION OR PROBLEM?**
D L/F..... ___/32        TREAD R/F.. Please tell our store manager. We value your opinion as much as your ___/32    TREAD L/R..... ___/32
                         business. Should you need additional assistance, call our
                                    **CUSTOMER ASSISTANCE LINE**
                                         1-800-321-2136

IM # GBMS-027 04/02

# MATTHEWS TIRE & AUTO SERVICE

705 SOUTH MAPLE STREET
MARYSVILLE, OH 43040
(937)642-2881



INVOICE
525190

AGE: 01

08/21/02 08/21/02
11:34 AM 11:42 AM
TERR: 1678
NONSIG: 184731

ILL TO: PAUL BEDEWI
20946 COHASSET
ASHBURN, VA 20147

HONE 1.......      VEH YEAR/MAKE. 00 LOOSE
HONE 2.......      VEHICLE MODEL. RIMS
ATE REQUESTED 08/21/02    VEHICLE COLOR.
IME REQUESTED         LICENSE/STATE. 0 /
ETURN PARTS.. NO       ODOMETR IN/OUT 0 / 0
ALESMAN...... 005 / 005

COUNT #   COB  TC  CUST#  TYPE/STATE  AUTHORIZATION  CREDIT CARD NO.
7900051   M    01  07012  0    OH     242344    HDC  5410654511946219

| SM | TECH | PRODUCT CODE | BC | QTY | DESCRIPTION | PARTS | LBR/EXCISE | LINE TOTAL |
|----|------|--------------|----|-----|-------------|-------|-----------|------------|
| 5 | 022 | 044-263 | R | 2 | WHEEL BALANCE - COMPUTER SPIN | .00 | .00 | .00 |
| 5 |  | 397-000-001-0 | R | 2 | USED TIRES | 20.00 | .00 | 40.00 |
| 5 | 022 | 041-263 | R | 2 | NEW VALVE STEM | .00 | .00 | .00 |
| 5 | 022 | 044-263 | R | 2 | WHEEL BALANCE - COMPUTER SPIN | .00 | .00 | .00 |

*TIRES for CAR MUFRI Test AT TO BE USED FHWA- FOIL for TESTING*

*Paul Bedew*

CU'   -AUTHORIZATION FOR TOTAL

INVOICE TOTAL

| | | |
|---|---|---|
| CHARGED AMOUNT | 44.52 | PARTS TOTAL........ 40.00 |
| STATE TIRE FEE | 2.00 | LABOR TOTAL........ .00 |
| TAXABLE AMOUNT | 42.00 | SUB TOTAL.......... 40.00 |
| | | SALES TAX.......... 2.52 |

**INVOICE TOTAL     $44.52**

# SLE REVERSE SIDE FOR IMPORTANT SAFETY WARNING AND WARRANTY INFORMATION

**HAVE A QUESTION OR PROBLEM?**
Please tell our store manager. We value your opinion as much as your
business. Should you need additional assistance, call our
**CUSTOMER ASSISTANCE LINE**
1-800-321-2136