**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Criminal No. 05-301-01 (RWR)** |
| **PAUL  G. BEDEWI** | |
| **Defendant** | |

**DEFENDANT PAUL G. BEDEWI'S**
**MEMORANDUM IN AID OF SENTENCING**

Paul Bedewi, by his undersigned counsel, respectfully submits this Memorandum In Aid of Sentencing. Mr. Bedewi is before the Court for sentencing pursuant to his having entered a guilty plea to a one-count Information charging him with a violation of 18 USC § 666.  The prosecution and defense agree that the proper Sentencing Guidelines level is 12, which provides a sentencing range of 10-16 months.  Absent a departure,  the Guidelines require that a defendant at Level 12 serve at least five (5) months imprisonment followed by a period of supervised release "with a condition that substitutes community confinement or home detention" for the other five (5) months imprisonment. U.S.S.G. § 5C1.1(d)(2).  If the Court chooses to impose a sentence under the Sentencing Guidelines, the defense submits that the sentence should be the minimum sentence permitted at Level 12.

Mr. Bedewi, however, respectfully requests that the Court impose a sentence that varies downward from the minimum sentence available under the Sentencing Guidelines and that he be allowed to serve this sentence in a community confinement facility or under home detention (or a combination of the two).  If permitted to serve his sentence in a community facility or at his

home Mr. Bedewi, the sentencing term is immaterial (provided, of course, it does not exceed the statutory limit).

Four considerations support this request and establish its reasonableness under 18 U.S.C. §3553(a). The first two involve significant post-offense conduct that would themselves support a downward variance from the Sentencing Guidelines. The first involves Mr. Bedewi's response when confronted by George Washington University ("GW") in August 2004. When GW first confronted him with the evidence its accountants and lawyers had gathered during their review of financial records, Mr. Bedewi admitted what he had done and made immediate and complete monetary restitution. Mr. Bedewi did this several months prior to GW's reporting his conduct to law enforcement authorities.

In addition, as part of his plea agreement, Mr. Bedewi volunteered to assist the U.S. Attorney's Office and investigative officials in their efforts to determine the scope of financial misconduct at GW. Mr. Bedewi truthfully answered all questions put to him and took affirmative steps to alert them to what he believed to be questionable handling of at least one multi-million dollar financial account by senior GW personnel as well as other questionable conduct by faculty members. Even though this information did not lead to the initiation of any criminal charges against other GW officials, the government has advised that it found no basis to question the truthfulness of Mr. Bedewi's responses to their inquiries or with respect to the matters he raised.

The other two factors are less concrete but are nonetheless relevant to the Court's application of the factors in §3553(a) to Mr. Bedewi's case. The first of these is the anomalous nature of Mr. Bedewi's admitted wrongdoing while employed as a Research Scientist at GW from May 2002 until his resignation in August 2004 when juxtaposed against a record that is

marked not only by spectacular academic and athletic accomplishments but also by the uniformly high regard of those who have worked with him before and after his GW employment. As we discuss below, §3553(a)(1) expressly requires that the sentence take into account his "history and characteristics"; and it seems that the Court would need to consider such information in order to determine the weight accorded sub-section (a)(2)(C) (likelihood of further criminal conduct).

The final factor is the impact on Mr. Bedewi of a circumstance that, although unique to his case, is nonetheless critically important if the Court is to make a valid assessment who Paul Bedewi is now versus who he was in 2002 when he started at GW or in 2004, when criminal conduct was discovered. That circumstance is his father's debilitating two-year struggle against pancreatic cancer, a disease that manifested itself in 2004, was diagnosed in 2005, and which took his life in July 2006, The combination of the role that his father played in Mr. Bedewi's life and his belief that he must keep this case a secret lest he harm his father's already marginal possibility of recovery served to dramatically intensify the impact of these proceedings while also serving as the touchstone for a more searching and intense introspection and self-examination by Mr. Bedewi. This effort has produced at least three salutary results for Mr. Bedewi: an appreciation that his conduct at GW was a manifestation of the degree to which he had abandoned the precepts and principles that his father lived by and worked to instill in him; a recognition that this abandonment is what got him in trouble; and a heightened resolve to change course. These factors are addressed in greater detail below.

### A. Mr. Bedewi made full restitution to George Washington University in August 2004 and does not owe an additional $18,738, as claimed in the Victim Impact Statement.

At the outset, the defense believes it important for the Court to know that the following discussion of restitution is not driven by a desire on Mr. Bedewi's part to avoid paying more money if it could be shown that the $80,000 fails to cover the entirety of the loss suffered by GW as a result of his wrongful conduct. We address GW's newly asserted claim to additional restitution only to address the possibility, however remote, that GW 's efforts have raised a question in the Court's mind whether Mr. Bedewi actually made full restitution in August 2004 when he was first confronted by GW. Until GW's submission of the Victim Impact Statement ("VIS") two years after he made his $80,000 payment, Mr. Bedewi reasonably believed that he had done so, especially after law enforcement officials reviewed the matter in 2005 and arrived at a loss/restitution amount that was smaller than the $80,000 he had already paid. In point of fact, he is correct.

The defense believes that GW's decision to wait two years before asserting for the first time that Mr. Bedewi still owes $18,738; and its inclusion of items that are clearly not susceptible to recovery as restitution in a criminal proceeding manifest GW's desire to create confusion with respect to Mr. Bedewi's early acknowledgment and fulfillment of his monetary obligation. Support for this belief is readily discoverable by examining GW's conduct over the past several months. For example, with Mr. Bedewi's sentencing scheduled for August 24, 2006, GW's deputy general counsel wrote to Mr. Bedewi's counsel on July 13, 2006 (one week after GW submitted the VIS to the Probation Office) demanding payment of the same $18,738 it had included in the VIS (and an additional $104,040) "within ten days". Exhibit 10. This attempt to subvert the established statutory procedures under 18 U.S.C. §3663A for asserting entitlement to

restitution raises a significant question with respect to the legitimacy of GW's claim and its motivation in making it two years after Mr. Bedewi had made his good-faith payment.

Mr. Bedewi's counsel responded to GW's demand by letter to the deputy general counsel and attached both letters to a separate letter to the Probation Office that responded to the VIS and laid out the defense position on GW's entitlement to further payment from Mr. Bedewi. Exhibit 11. These several letters are included in the Addendum to the Presentence Report.

Unfortunately, the Presentence Report's characterization of the defense position ("Counsel points it out that the parties agreed to a specific amount of restitution and the defendant has exceeded his obligations by paying $80,000 in August 2004."  PSR at 18) is somewhat off the mark.  The defense is not asserting that there was a pre-arranged "specific amount of restitution". The defense position is as follows:

> The $80,000 that Mr. Bedewi paid to GW in August 2004 was based upon an item-by-item review of Mr. Bedewi's charges to the GW "P-Card" for the entire time he had use of the card.  The goal of the review was to identify improper expenditures and to calculate the dollar value of these expenditures.  All close calls resulted in the expenditure being included in the restitution amount. Once the P-Card repayment amount was calculated, it was added to the $36,000 stipend Mr. Bedewi's wife wrongfully received.  As a result of this effort, it appeared that a payment of $80,000 should cover Mr. Bedewi's financial obligation. The review by federal investigators in connection with Mr. Bedewi's guilty confirmed the accuracy of the defense calculation.  If there were a further obligation created by Mr. Bedewi's criminal misconduct, he would pay it; there was and is nothing sacrosanct about the $80,000.  But nothing in the VIS supports the claim for additional restitution based upon criminal conduct .

The timeline that follows makes clear Mr. Bedewi's efforts to meet his obligations.  It also highlights how GW's overheated desire for retribution has caused it to overreach and, arguably, mislead.

- **August 4, 2004 -** Mr. Bedewi and counsel met with auditors from Beers & Cutler and attorneys from Hogan & Hartson in connection with an internal investigation they were conducting for GW regarding the operation of the National Crash Analysis Center ("NCAC").  Counsel for Mr. Bedewi adjourned the interview shortly after it started so that Mr. Bedewi could review expense records and truthfully disclose his improper use of P-Card.

- **August 6, 2004 –** After reviewing all P-Card statements and supporting documents with counsel, Mr. Bedewi offered to immediately reimburse GW $80,000, based upon (a) his misuse of his P-Card, including his using the P-Card to pay more than $30,000 as the initiation fee at Beacon Hill Country Club; and (b) the stipend to his wife ($36,000). Although Mr. Bedewi and his counsel believed that this payment exceeded the loss caused by Mr. Bedewi, the parties agreed that GW's acceptance of this payment did not preclude its seeking additional restitution if it could show additional improper expenditures.  Mr. Bedewi immediately initiated his obtaining a home equity loan for necessary funds.

- **August 20, 2004 (approx.) –** Mr. Bedewi tendered a check in the amount of $80,000 to GW.

- **November 2004 –** Prosecutor advised Mr. Bedewi's counsel by telephone that he was working on a plea offer but needed to finalize calculation of loss/restitution amount.

- **March 7, 2005** – USAO sends to defense counsel a spreadsheet showing allegedly improper P-Card expenditures by Mr. Bedewi in the amount of $63, 294.47.  Exhibit 8. The total proposed loss/restitution amount, including the $36, 000 stipend, was $99,444.47.  The USAO later confirmed that GW  was the source of items included in

the spreadsheet.   (It is worth noting that by March 7, 2005, Beers & Cutler had been auditing the NCAC books for at least nine (9) months.  Given that seven (7) months earlier Beers & Cutler had confronted Mr. Bedewi with his improper use of the P-Card to purchase a membership at Belmont Country Club; and in light of the prosecutor's November 2004 message to defense counsel that the USAO was awaiting a loss/restitution amount in order to tender a plea offer, it seems highly unlikely that the auditors had not fully reviewed Mr. Bedewi's P-Card records by March 2005.  Mr. Bedewi and his counsel had taken less than two days to review his P-Card transactions.

- **May 9, 2005** – Defense counsel conveyed to USAO a mark-up of the March 7, 2005, spreadsheet with explanations for items challenged by defense.  (Exh. 9).  The dollar value of items challenged by defense is $20,842.24, which reduced improper P-Card expenditures to  $42,452.23 and the total obligation to GW to $78,602.23.

- **August 10, 2005** – After reviewing Mr. Bedewi's explanations in the May 9, 2005, spreadsheet and (presumably) consulting with GW,  USAO filed an Information which adopted the $78,602.23, amount from the May 9, 2005, spreadsheet, as the amount of loss that was suffered and restitution required.

- **October 24, 2005 –** USAO files Plea Agreement and Statement of Facts which also contain the amounts reflected in the May 9, 2005, spreadsheet.  Mr. Bedewi entered his guilty plea before the Court. Representatives of GW, including outside counsel handling this matter, attended the proceeding.  Mr. Bedewi did not request a refund of the difference between the $80,000 he paid in August 2004 and the loss/restitution amount of $78,602.23 reflected in the documents filed with the Court.

- **July 7, 2006 –** More than eight months after entry of the plea – and almost two years after Mr. Bedewi tendered his $80,000 payment and offered to make an additional payment if GW found additional illegitimate expenses incurred by Mr. Bedewi through his use of the P-Card – GW filed its VIS in which it claimd *for the first time* that Mr. Bedewi owes an additional $18,738 in restitution. *The spreadsheet that GW included in the VIS contained approximately 81 items that were not included in the March 7, 2005, draft spreadsheet that the USAO and investigators created from information provided by GW.* Among the items in this new spreadsheet are claims for restitution of certain repeated monthly expenditures, *e.g.,* monthly AT&T bills for wireless phone and data services used in connection with NCAC business and paid for by GW; and for expenditures incurred throughout the period that Mr. Bedewi used the P-Card, *e.g.,* meals in the District of Columbia metropolitan area with other GW personnel and third-parties. Most of these expenses do not appear in Exhibit 8, the government's draft spreadsheet (although other types of expenditures in the same months as the newly claimed charges in the VIS do appear in Exhibit 8).

As defense counsel noted in his November 7, 2006, letter to the Probation Office, items that appear for the first time in the VIS include, *inter alia:* (1) a claim for restitution of approximately $5,300 to cover *all* AT&T wireless phone and data service charges, on the grounds that Mr. Bedewi should have used a less expensive plan; (2) a $3,200 claim for restitution of expenditures in connection with a computer, cordless phones, and various office supplies, all of which remain in GW's possession (the auditors apparently felt these expenses were unnecessary); and (3) hotel costs and meals while Mr. Bedewi was on legitimate travel, some of which were on the March 2005 list but

which the prosecution agreed to eliminate from the final list after receiving Mr. Bedewi's explanation of their legitimacy.

In addition, of the 26 items in the VIS that were also in the government's March 7, 2005, spreadsheet, 22 of them are listed in Exhibit 9, the list agreed to by the government and the defense as reflecting Mr. Bedewi's restitution obligation and the loss amount. As for the other four items (which represent approximately $7000 of the additional restitution GW now seeks), the government agreed with Mr. Bedewi's explanation that these items did not constitute improper expenditures and, therefore, these items were excluded from the list of items for which Mr. Bedewi was obliged to make restitution.

As counsel pointed out in the aforementioned letter to the Probation Office, when one eliminates from the VIS (a) the items for which restitution has already been made ($4,000); (b) the items that the government agreed were not subject to restitution in this proceeding ($7,000); and (c) the newly asserted claims for which GW has no plausible basis ($8,5000 for AT&T service and the computer, telephones and office supplies), GW's claims are reduced by approximately $19,500. This exceeds the additional restitution ($18,738) it seeks in the VIS.

It should be noted that this $19,500 reduction does not include claims in the VIS that are apparently based on GW's speculation about the nature of the expense (for example, GW's speculation that certain meals, including meals with research sponsors while Mr. Bedewi was on travel, should not have been placed on the P-Card because they were incurred late at night and included payments for liquor); and expenses for local meals with staff members and third-parties, challenged because of GW's purported policy against paying for local meals. This latter rationale is inconsistent with expense reports

that were approved by Dr. Azim Eskandarian, who remains a member of GW's faculty. Exhibit 12.

In sum, GW has presented no evidence to support their claim that Mr. Bedewi's payment of $80,000 in August 2004, prior to the initiation of the criminal investigation, requires supplementation. Accordingly, that payment constitutes complete restitution of all expenditures that GW incurred as a result of Mr. Bedewi's admittedly improper conduct.

GW also contends that Mr. Bedewi improperly obtained an additional $208,000 "from another GW grant" that had been provided by the Motor Vehicle Fire Research Institute ("MVFRI"). Although GW stated in the VIS that it was not seeking restitution of this amount, it nonetheless urged the Court to take this additional sum into account in fashioning Mr. Bedewi's sentence.

As counsel advised the Probation Office in his objections to the Presentence Report, *GW's assertion that the compensation Mr. Bedewi received from the MVFRI came "from another GW grant" is a false statement.* The money that the MVFRI paid to Mr. Bedewi was pursuant to a separate contract that Mr. Bedewi signed in February 2002 (before he officially joined GW's staff) with the MVFRI to provide consulting services. GW policy did not prohibit Mr. Bedewi from performing these additional services for a third-party. Although GW had a separate grant from MVFRI in the amount of $340,000 (obtained and administered by Dr. Azim Eskandarian), that grant was not the source of the payments that Mr. Bedewi received from MVFRI.

- **July 13th, 2006 –** See previous discussion of letter from Deputy General Counsel William Howard demanding payment of $18,738 "within 10 days" after this amount was

submitted to the Court in the VIS.  Mr. Howard's letter also raises the $208,000

compensation that Mr. Bedewi received as compensation for services he provided to the

MVFRI.  This letter is further evidence of the falsity of the VIS representation

concerning this money.  Howard asserts an entirely different rationale for GW's claim:

That Mr. Bedewi could not have actually performed the 92 hours a month (approximately

23 hours/week) consulting he claimed on his invoices to MVFRI while working his "full-

time" job at GW (presumably 40 hours/week).  Based upon this speculation concerning

Mr. Bedewi's supposed inability to shoulder a workload of approximately 63

hours/week, Mr. Howard and University officials "surmise that he was cheating both GW

and MVFRI in the process."

    Pointing out that "GW did not seek restitution for the outside consulting through the

criminal process," he nonetheless asserts GW's entitlement to "restitution" of the

$208,000 that Mr. Bedewi received in compensation directly from MVFRI because GW

supposedly suffered a "loss of funding opportunities that should have properly flowed

through the University and/or paid a full-time employee for a less than full-time work."

Howard never identifies the nature of the "lost funding opportunities"; never explains

how Mr. Bedewi's pre-existing consultancy caused such a loss; and, most importantly, is

completely silent on the question of GW's authority to claim entitlement to money that,

before paid to Mr. Bedewi, belonged to MVFRI (which has never complained about Mr.

Bedewi's work).

    Nonetheless, Mr. Howard demanded that Mr. Bedewi either produce for GW's

review all his work-product from the MVFRI consultancy or pay GW "one-half of the

MVFRI consulting fees that Mr. Bedewi received, meaning $104,040 in addition to the

$18,378 identified above."   Mr. Howard described this demand for the payment of
$104,040 that was never GW's in the first place as a "confidential settlement offer,"
which, like his demand for the $18,738, had a ten-day window.

- **October 30, 2006** -- Counsel for Mr. Bedewi responded to Mr. Howard's letter; as noted,
  counsel attached a copy of both this letter and Howard's letter to counsel's November 7,
  2006, letter to the Probation Office.  In this letter, counsel addressed in detail each of Mr.
  Howard's spurious claims and rejected his so-called "settlement offer," including its
  characterization as "confidential".  This letter is incorporated by reference in the
  Sentencing Memorandum. Exhibit 11.

- **November 7, 2006** – In a letter to the Probation Office, counsel for Mr. Bedewi
  addressed many of GW's specific claims.  Although additional review has refined the
  analysis of GW's current claims (set out above), the end result is the same: Mr. Bedewi's
  $80,000 payment to GW in August 2004 – months before this matter became the subject
  of a criminal investigation – more than covers his liability to GW for improper use of the
  P-Card and for the stipend that his wife received improperly.

The timeline hopefully clarifies the Presentence Report's arguably ambiguous description of
the defense position regarding the claim for additional restitution.  So that there is no
misunderstanding, the defense reiterates that from the moment Mr. Bedewi decided to
acknowledge his wrongdoing, he has been prepared to reimburse GW for the money it spent as a
result of his fraudulent and deceptive conduct. Counsel told this to GW at the time he tendered
the $80,000.  But that commitment does not entitle GW to seek restitution through the criminal
process for computers and telephones and office supplies (and legitimate phone services) – all of
which Mr. Bedewi had authority to purchase and all of which were used for the conduct of

NCAC business and left in place when Mr. Bedewi resigned – because the auditors have decided

that the NCAC did not really need them .  The defense submits that the only reason GW has

attempted to obtain criminal restitution for such items is to sow confusion concerning Mr.

Bedewi's efforts to address his wrongdoing early and completely.  GW's false statement

concerning Mr. Bedewi's MVFRI consultancy is further evidence of GW's malicious intent.

Based on these facts, Mr. Bedewi respectfully requests that the Court find (a) that in August

2004 he made full and complete restitution of all expenditures he caused GW to make through

his criminal conduct; and (b) that his $80,000 payment to GW at that time exceeds the loss that

GW incurred as a result of his criminal conduct.

## B. There are four considerations identified at the outset of this memorandum justify the Court's imposing a sentence that varies from the Sentencing Guidelines.

Because Mr. Bedewi's Guideline score of 12 falls within Zone C of, the Sentencing Table,

the Court could impose a sentence that would require Mr. Bedewi to serve five months in prison

followed by five months of either community confinement, home detention, or some

combination of the two.  If the Court decides to impose a sentence within the range permitted at

Level 12, Mr. Bedewi requests that for the reasons discussed below the Court impose the

minimum sentence available under the Guidelines and that the five month mandated prison term

be followed by home detention rather than community confinement.

However, the defense submits that there is ample basis for the Court to impose a shorter term

of imprisonment and a longer period of either community confinement or home detention.  None

of the factors identified in 18 U.S.C. § 3553(a) requires that a term of imprisonment be imposed

in light of the factors discussed below.  However, if the Court determines that Mr. Bedewi must

be punished by some period away from the community, he requests that the Court impose a term

of no more than sixty (60) days.

1. **Restitution**

Notwithstanding the policy statement contained in Guideline § 5K2.0(d)(5) banning a

departure for restitution in the amount required by either statute or Sentencing Guidelines

provision, the defense submits that Mr. Bedewi's early and complete restitution in excess of the

loss actually suffered by GW provides a basis for varying the defendant's sentence below the

minimum sentence available under the Sentencing Guidelines.   Because the Court is not bound

by the Sentencing Commission's inflexible treatment of this issue, the Court is free to

acknowledge the empirically verifiable observation that it is an extraordinarily rare event for an

accused person to make complete restitution when he is first confronted with criminal allegations

and prior to notification of law enforcement officials.  Not only did that occur in this case, but

Mr., Bedewi went further: he accompanied his $80,000 payment with an open-ended promise to

make further payment(s) if GW found additional instances in which he had made improper use

of the P-Card.  Moreover, he never sought any consideration from GW in exchange for this

payment, *e.g.,* a favorable statement to law enforcement officials to whom GW would be

reporting Mr. Bedewi's conduct.

In deciding whether Mr. Bedewi's immediate restitution justifies a downward variance, the

Court might also take into account that Mr. Bedewi (and his family) had to borrow at

commercial rates the funds needed to accomplish restitution and that for the past two years has

paid interest on that loan.  Finally, the defense would note that at the time he assumed this

burden, he had just lost his job and had no identifiable prospects in the area of expertise.

The Guidelines' inflexible refusal to acknowledge the significance of such conduct ignores

two legitimate reasons supporting a more flexible response.  First, the unconditional willingness

to begin make tangible amends evinces the genuine quality of a defendant's acknowledgment of the wrongfulness of his conduct. It is surely not unreasonable for a court to decide that the defendant who takes this step is worthy of sentencing treatment that is more favorable than a defendant who does nothing while he waits for the court to order him to do what Mr. Bedewi voluntarily did under difficult circumstances.

A second legitimate consideration is that favorable treatment of such conduct may have a salutary effect on other defendants who may be in a position to make restitution sooner rather than later.  Although the Guidelines allow for such treatment, its availability is restricted to "voluntary disclosures" under circumstances in which "a defendant, motivated by remorse, discloses an offense that otherwise would have remained undiscovered." Guideline §5K2.16. Conceding that such internally driven transformations are the paradigm, the defense nonetheless suggests that relegating all other cases to Guideline § 3E1.1, "Acceptance of Responsibility" ignores the real life consequences to both the defendant and the victim from early restitution. Moreover, there is at least the potential to effect socially-beneficial conduct if it becomes known that the sentencing system will respond positively to a defendant who takes tangible and unconditional action to recompense a victim or otherwise ameliorate the consequences of his criminal behavior when initially confronted with these allegations.

In sum, the defense the defense simply suggests that in a post-*Booker* world, the Court is free to include in its sentencing calculus conduct that separates Mr. Bedewi from all but a handful of defendants, and it is surely reasonable for the Court to do so.

2. **Assistance to the Government**

Mr. Bedewi's Plea Agreement provided for his cooperating with the USAO and federal investigators in their investigation into the financial management of the NCAC and related

matters.  Mr. Bedewi had three interviews with the prosecutor and investigators. He answered all their questions and withheld nothing.  In addition, he brought to their attention financial records that raised questions in his mind about the way certain grantor funds were being used, that is, in a manner which, if not clearly improper, was highly questionable.

The USAO has decided, however, that it will not bring any new cases as a result of the information provided by Mr. Bedewi and, for that reason, will not move for a departure under Guideline § 5K1.1.  Nonetheless, the prosecutor has confirmed to defense counsel that Mr. Bedewi's responses to the government's inquiries and the information he brought forward *sua sponte* were truthful and complete and that the government had no reason to doubt his word. The defense further advises the Court that Mr. Bedewi's offer of assistance was timely, having been tendered by his counsel at his first meeting with the prosecutor and investigating agents. Because a government motion is no longer a mandatory precondition to the Court's considering Mr. Bedewi's assistance as a factor in fashioning a reasonable sentence under 18 USC 3553(a), the defense respectfully submits that Mr. Bedewi's efforts in this regard provide an additional ground for imposing a sentence that varies downward from the minimum sentence permitted under the Sentencing Guidelines for a Level 12 offense.

3. **Mr. Bedewi's conduct during his tenure at GW is anomalous.**

Appended to this Memorandum in Aid of Sentencing as Exhibit 1 is a lengthy letter from Mr. Bedewi to the Court.  In his letter, he candidly discusses his efforts to come to grips with his behavior that brings him before the Court.  He also tries to relate for the Court the impact that going through this process (while at the same time dealing with the anguish of watching his father succumb to pancreatic cancer) has had on his values and the way that he now chooses to live his life.

Also appended as Exhibit 2 is a copy of a letter that counsel wrote to the Virginia Real Estate Board, which is considering whether to permit Mr. Bedewi to continue working as a real estate agent. The letter recounts Mr. Bedewi's lifelong history of superlative achievement and outstanding leadership academically, athletically, and professionally. It also relates counsel's first-hand observations of the profound attitudinal changes that Mr. Bedewi has undergone in the period since their first meeting more than two years ago. Although the letter clearly mixes the roles of advocate and percipient witness, after thinking it over counsel decided to include it. The Court will readily identify the portions that venture into the subjective and attach whatever weight, if any, that counsel's candid observations of the Paul Bedewi he met in August 2004 and the man that stands before the Court today may merit.

We have also included letters from Dr. Stephen Rouhana, a Senior Technical Leader in Safety who was one of Mr. Bedewi's two principal supervisors during his four-year employment at Ford Motor Company, where he worked before returning to GW in 2002 (Exhibit 3); and Mr. John Sullivan, his other Ford supervisor. (Exhibit 4)   The letters from Mr. Thomas Donegan, the real estate broker for whom Mr. Bedewi currently works (Exhibit 5); and from Ms. Cheryl Thomas, Mr. Bedewi's "team member" with whom he has daily contact at Mr. Donegan's brokerage (Exhibit 6) share their respective observations of Mr. Bedewi "post-GW".

Both Dr. Rouhana and Mr. Sullivan confirm that in their respective conversations with Mr. Bedewi he did not try to duck responsibility for his conduct ("he took responsibility for his role in ["the offenses"]" (Rouhana); he "was up front" about what he had done and "made no attempt to pass the blame elsewhere"(Sullivan)). They each sensed that his expressions of contrition were genuine (He "sounded genuinely sorry" and was "clearly embarrassed by his actions" (Rouhana); He "deeply regrets his involvement". (Sullivan)). Significantly, based on the

character and conduct of the man they each saw on a daily basis for separate two-year periods,, they could hardly believe what Mr. Bedewi recounted to them regarding his conduct ("not in a million years" (Rouhana);  "we were stunned" and  "could only conclude that there must be some mistake". (Sullivan)).  As Mr. Sullivan states: "Never once did he exhibit any behavior that led me to doubt his integrity or honesty."

Thomas Donegan and Cheryl Thomas, his current boss and co-worker, are even more emphatic in expressing their personal and professional regard for Mr. Bedewi; their belief in his honesty and integrity ("The actions that brought Paul here today are extremely out of character."(Thomas)); and their "complete confidence that [these actions] will not be repeated in the future." (Thomas).  Each makes the point that their respective backgrounds – Donegan is former military intelligence officer with a father and brother retired from the FBI; Thomas and her husband have held high level security clearances requiring regular polygraphs – make them particularly sensitive to associating with someone of questionable character.  Neither has any question about working with Paul Bedewi.  Indeed, Mr. Donegan, whose continued success depends upon the honesty and integrity of his agents, is willing "to not only help him maintain his license"; he "would also accept any responsibility to help [ "monitor his actions and to insure he complies with the requirements of the Court and the [Virginia Department of Professional and Occupational Regulation]." Any further attempt to summarize these letters would hardly do them justice and is hardly necessary; the Court will no doubt read them and accord them whatever weight the Court deems appropriate.

Finally, we have appended a letter from Dan Wasserman (Exhibit 7), Mr. Bedewi's neighbor and a principal in the company that developed the Online Predator Profiling System (OPPS), a database that monitors Internet chat rooms and helps law enforcement officials "identify and

track potential predators".   Mr. Wasserman describes how Mr. Bedewi used his technical background to assess the efficacy of the product and then paid nearly $2,000 so that law enforcement officials in Fairfax and Loudoun counties (who did not have the discretionary funds to purchase licenses) could be the first jurisdictions to employ this technology.  Mr. Wasserman also recounts Mr. Bedewi's efforts to enlist other sponsors for other jurisdictions, including his successful enlistment of the Washington Redskins Charitable Foundation to promote these sponsorships and to match contributions dollar-for-dollar.

The activities described by Mr. Wasserman and actions such as Mr. Bedewi's willingness to forego income he could have used so that he could help a 32-year old recently widowed single mother sell her house and put aside some money for her young child (recounted in Exhibit 2), characterize the Paul Bedewi that is before the Court today.   Furthermore, the person described by Ms. Thomas, Mr. Donegan, and Mr. Wasserman is much like the person described by Dr. Rouhana and Mr. Sullivan, as well as the one observed by counsel.  There is no question that the people who spend time around Mr. Bedewi both like and respect him.  More importantly, they have no doubts about his integrity and honesty.

But if the person they describe is the "real" Paul Bedewi,  then how does one account for the person who felt entitled to spend GW's money for a trip to Las Vegas to attend his friend's wedding (and pay for the bachelor party and a variety of other expenses)? What is to be made of his arranging for country club personnel to issue phony catering invoices for supposed professional conferences so that he could cover-up his use of the P-Card to pay the club's $30,000 initiation fee? Or his allowing his non-student wife to receive a graduate student stipend?  There is no simple explanation for why a person of such exceptional abilities and fundamentally strong character engages in such behavior on a repeated basis.

But the defense suggests that part of the answer – an important part with respect to determining the appropriate sentence for Paul Bedewi – is found in the relationship between Paul Bedewi and his older cousin, Nabih.   Nabih clearly held an exalted position within the extended Bedewi family: a university professor in an immigrant family, he was held up as a role model for the younger cousin.  Nabih is why Paul Bedewi chose GW for his graduate school work when he could have gone to any number of the premier engineering schools.  Nabih is also the reason that Paul Bedewi walked away from Ford and returned to GW in 2002.  To say this is not to diminish Paul Bedewi's personal responsibility for the choices he made and for which he has paid and will pay a stiff price.  But to a person, the employees at the NCAC attest to the force of Nabih Bedewi's personality and to the self-serving philosophy of entitlement he promulgated:  GW is stingy, we bring in the money, we work hard, we are entitled to rewards. Counsel could not help but be amazed as intelligent professionals attested to Nabih Bedewi's personal generosity and his readiness to relieve a subordinate's financial strains – as if the money he spread around were his own and not GW's.  Paul Bedewi, awash in the millions of dollars that was floating around the NCAC, found it all too easy to rationalize his conduct – "the country club would be a place to entertain sponsors" -- and give himself those rewards.

Having said all this, Mr. Bedewi appreciates that there are consequences to the choices *he* made and the actions *he* took as an adult.  In fashioning its sentence, the Court will surely give consideration to the factors set out in 18 USC 3553(a), including "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed to protect the public from further crimes of the defendant".  These factors recognize that the fashioning those consequences ought be informed by, and take account of,  more than just the immediate conduct that brings the defendant to the courthouse.

The materials submitted to the Court are an attempt to inform the Court of Paul Bedewi's "history and characteristics" and also to enable the Court to assess whether this defendant poses an ongoing threat to the public's welfare.  Paul Bedewi's "history and characteristics,"  are recounted in counsel's letter to the Virginia Real Estate Board (Exhibit 2); attested to by the persons who have worked with Paul Bedewi before and after his tenure at GW; and reflected in Mr. Bedewi's letter to the Court.  The defense submits that the case they make for mitigating the sentence called for under the Guidelines is a compelling one.

The defense would further suggest that these materials are worthy of the Court's consideration in assessing  "the need for the sentence imposed to protect the public from further crimes of the defendant" and to its full appreciation of  the "nature and circumstances of the offense" that brings Mr. Bedewi to this place.  The most salient fact that one takes away from these accounts is the vast difference between the Paul Bedewi reflected in the history of achievement and, most importantly, described by the people who have come to know him either before or after GW; and the Paul Bedewi who worked at GW.  It is conceivable, one could suppose, that Dr. Rouhana, Mr. Sullivan, Mr. Donegan, and Ms. Thomas – each of whom has worked with Mr. Bedewi on a daily basis for extended periods of time – have all been duped, and that the real Paul Bedewi is the one who filled out the phony expense reports and allowed his wife to accept a stipend that she did not deserve.

But the defense submits that this conclusion would be contrary to the weight of the evidence and inconsistent with human experience.  Thus, while Mr. Bedewi must surely be sentenced for what he did, the defense suggests that the demonstrable disparity between the Paul Bedewi at GW and the Paul Bedewi on whom Tom Donegan is willing to bet his business and his

reputation further supports the reasonableness of a sentence that varies downward from the Guidelines.

   **4. The lengthy illness and recent death of his father during the pendency of this case have enhanced Mr. Bedewi's appreciation not only of the wrongfulness of his conduct at GW but also of the degree to which he had strayed from the values that he had learned from his father and that had guided his conduct.**

   The defense acknowledges that, as a general proposition and empirical fact, the post-offense illness and death of a defendant's parent are not relevant considerations in fixing the term and conditions of a criminal sentence. In this case, however, two events have dominated Paul Bedewi's life between Spring/Summer 2004 and Summer/Fall 2006: (1) the collapse of his professional existence/criminal prosecution/finding a way to support his family; and (2) his father's two-year struggle against pancreatic cancer and his passing in July of this year. On the one hand, dealing with these events at the same time has meant coming to terms with the fact that by his own hand Paul Bedewi had managed to destroy a brilliant career and throw his family life into complete turmoil *because* he failed to adhere to the values he had grown up with and always lived by. And it has also meant not simply living with the long illness and death of a parent, but of a parent who was an iconic figure, the person who by words and deeds had tried to instill in his son the values that Paul Bedewi jettisoned when he returned to GW in 2002.

   While either of these wrenching events would surely generate self-examination and soul-searching in any sentient human being, their confluence in Paul Bedewi's life has intensified these processes exponentially. More pertinent to the purposes of these proceedings, they have had the salutary effect of deepening Mr. Bedewi's appreciation not only of the wrongfulness of his conduct but also of his deviation from the path his father had shown him by word and deed. The court need not rely solely on Paul Bedewi's word for that; Tom Donegan's letter describes

Mr. Bedewi's anguish over his father's death and offers the observation that "the passing of his father greatly changed his perspective on life."

Had his father's illness not arisen at the same time Mr. Bedewi's professional life was collapsing and this prosecution was looming, Mr. Bedewi would undoubtedly have disclosed these events to his father and suffered the latter's disappointment and disapproval but also experienced his love and support as he moved through this process. In this instance, that was not possible: the disease, and the lengthy and difficult surgery he underwent in an effort to save his life, left the elder Mr. Bedewi in a condition where mere survival took all his energy. As a result, Paul Bedewi chose not to tell his father. Maintaining his secret was a difficult choice that became even more so over the past year, when Mr. Bedewi and his family he spent  months at a time at his parents' Arizona home.

But one needn't have a degree in psychology to know that Paul Bedewi has "discussed" this matter with his father on more than one occasion – the conversations have simply taken place in his head. The impact of what Paul Bedewi heard "his father" say is set out at length in his letter to the Court. While this internal process was in many ways more painful and unrelenting, it also yielded one benefit which, the defense suggests, is worthy of the Court's consideration in fashioning Mr. Bedewi's sentence: it has, we submit, enhanced Mr. Bedewi's internalization of the values his father had sought to instill. The defense suggests that the changed perspective that Tom Donegan notes is a reflection of Mr. Bedewi's deeper understanding of and commitment to the things his father taught him.

This process has required Mr. Bedewi to take a hard look at some unpleasant truths about himself:  that he surely was not acting on his father's value system when he was at GW;  that had he adhered to his father's values, he would not be before this Court convicted of a felony and his

family's life in the balance; that the material goods he purchased with the P-Card – all of which are gone – could not relieve the pain of "his father's" disappointment in him (or his disappointment in himself); and that the only way to win back "his father's" esteem (and his own) is to start living the values his father believed in.

The letters from Cheryl Thomas, Tom Donegan, and Dan Wasserman (Exhs. 5-7) attest that this is precisely what is happening. The defense would argue that permitting Mr. Bedewi to continue down the path he has charted – with severe and clearly articulated consequences should he stray – will ultimately yield a more sustainable protection to the public than putting him in a prison camp for five months. The Court, of course, will decide whether the need for a "just punishment" compels a term of imprisonment. The defense would suggest that it does not. To the contrary, the defense would also suggest that whatever incremental punitive value one attaches to the difference between, on the one hand, a lengthy sentence of community confinement – which would remove Mr. Bedewi from his comfortable home environment but permit him to stay under the beneficial influence of Mr. Donegan; and, on the other, sending him to a minimum security institution, has too high a price tag: the forfeiting of the positive consequences – concededly to himself, but to the public as well – that have flowed from his actions over the past two years.

Respectfully submitted,

_____/S/_____

Steven C. Tabackman (DC Bar No. 934539)
TIGHE PATTON ARMSTRONG TEASDALE
1747 Pennsylvania Avenue NW
Suite 300
Washington DC 20006
(202) 454-2811
(202) 454-2805