# TIGHE PATTON ARMSTRONG TEASDALE, PLLC
### ATTORNEYS AT LAW

1747 PENNSYLVANIA AVENUE, N.W.
SUITE 300
WASHINGTON, DC 20006-4604

TELEPHONE (202) 454-2800
FACSIMILE (202) 454-2805
www.tighepatton.com

STEVEN C. TABACKMAN
WRITER'S DIRECT DIAL: (202) 454-2811
EMAIL: stabackman@tighepatton.com

December 1, 2006

William F. Howard, Esq.
Deputy General Counsel
George Washington University
2100 Pennsylvania Avenue, NW
Suite 250
Washington DC 20052

**Re: Paul Bedewi**

Dear Mr. Howard:

    This letter is in response to yours of November 27, 2006. As a preliminary matter, I'm not certain of the purpose of your observation that three months passed between the filing of George Washington University's ("GW") Victim Impact Statement (VIS) on July 7, 2006 and my response to it. GW has known since August 2004 (or shortly thereafter) of the expenditures which it raises for the first time in the VIS and of Paul Bedewi's contractual relationship with the Motor Vehicle Fire Research Institute ("MVFRI") for longer than that (your outside counsel and your colleague Ms. Adams separately commented on it in conversations I had with each of them in the August 2004 timeframe.) In light of the two years that GW allowed to pass before raising its claims in connection with these items – despite its having retained Hogan & Hartson, Wiley, Rein & Fielding, and Beers & Cutler to work on this matter – an objective observer might question the justification for your "rhetorical indignation" at my taking a mere fraction of that time to respond.

    Turning to more substantive matters, I will address the issues you raise in the order you present them.

    1. You go on at some length, quoting several paragraphs from your August 19, 2004, letter, to make the undisputed point that when we tendered Mr. Bedewi's payment of $80,000 in August 2004, both sides understood that GW might *seek* additional reimbursement for expenditures caused by Mr. Bedewi's wrongful use of the P-Card. It seems that you missed my express acknowledgment of this precise point at page 3 of my October 30, 2006 letter, which states:

> As you know, *when Mr. Bedewi made his payment of eighty-thousand dollars ($80,000) in 2004, he expressly stated that he would consider any additional restitution claims that GW might make.* We extended this offer even though we believed that our own review of his P-Card expenditures was comprehensive; we included every expenditure that was even potentially subject to challenge as an "unauthorized use" of the P-Card because the goods or services purchased had no business purpose

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 2

> or otherwise evinced a wrongful intent to mislead GW as to the purpose of the expenditure. (Emphasis supplied.)

In light of this acknowledgment, the lengthy quotations from your August 19, 2004, letter were both unnecessary and, more important, completely beside the point.

2. My objections to the items identified in the VIS and referred in your letter of July 13, 2006, are neither "reflexive" nor predicated upon the mere fact that GW belatedly decided to assert them. I am disappointed that you found my letter "rambling"; I tried to set out these objections with as much precision as my limited skills would allow. Perhaps isolating the pertinent portion of my letter will assist in your understanding my objections:

> After reviewing the *VIS* list of items for which GW seeks additional payment from Mr. Bedewi, I have concluded that the items in that list reflect expenditures that have either (a) been reimbursed by Mr. Bedewi's $80,000 payment; or (b) are not properly subject to reimbursement through restitution because they are not really "fraudulent intent" expenditures properly subject to restitution in a criminal case.

Immediately following this general statement of the objection, I identified specific examples of the items within the categories described in the preceding sentence. I quote again from my October 30 letter:

> Most of the items that make up [GW's] current demand are of the second type, *e.g.*, the purchase of computer equipment that GW has in its inventory but which it now wants Mr. Bedewi to pay for (while GW presumably gets to keep the hardware); his supposed failure to use the least expensive telephone service; his purchase of supplies that went into GW's inventory. GW's current list of expenditures appears to reflect an effort at recouping from Mr. Bedewi *legitimate* expenditures for the operation of the NCAC.

> Even if I were to assume that federal contract auditors (or perhaps GW's own auditors) have challenged these expenditures as excessive, they are not recoverable in a criminal case absent proof that they were evidence of some fraudulent activity by Mr. Bedewi or that he improperly diverted an item for his personal use.

I don't know how I could have made the point any more clearly. If you believe that GW has a cause of action against Mr. Bedewi for his having purchased a computer, or cordless phones, or excessive office supplies, all of which GW has in its possession (assuming the supplies have not been exhausted); or for his having used a voice and data service that your auditors believe to have been overpriced, you are free to assert it in the appropriate forum.

That forum is not, however, a criminal proceeding in which the sole purpose of "restitution" under the Mandatory Victim Restitution Act is to compensate a "victim" to the extent that this person or entity has been "directly and proximately harmed *as a result of the commission of an offense for which restitution maybe ordered. . . .*" 18 U.S.C. § 3663A (a)(2). (Emphasis supplied.) In this case, the Criminal Information and Statement of Facts filed by the United States Attorney's Office set out the nature and scope of Mr. Bedewi's criminal conduct (that is his "offense for which restitution may

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 3

be ordered") in ¶¶ 4 and 6 of each document (these paragraphs contain identical language in each of these documents). Paragraph 4 covers the $36,150 stipend received by his wife, while paragraph 6 covers expenses incurred through his misuse of the P-Card. The operative language describes Mr. Bedewi's criminal conduct as his having "caused GWU funds and property . . . to be *knowingly and willfully embezzled, obtained by fraud and converted for the benefit of Paul G. Bedewi and his family members*, . . . (Emphasis supplied.) The computers, office supplies, telephone services, and any other item in the VIS that was not "knowingly and willfully embezzled, obtained by fraud and converted for the benefit of Paul G. Bedewi and his family members" does not qualify for restitution in connection with a criminal case.

    3. As for your complaint that in my previous response I "selectively" chose to focus on some of the expenditures for which GW seeks restitution, I would point out that your letter identified only one specific P-Card expenditure. Here is what you said in the first paragraph of your letter with respect to the nature and scope of the obligation that you claim Mr. Bedewi has to GW:

> As you are aware from the victim impact statement, The George Washington University recently submitted in connection with Paul Bedewi's upcoming sentencing, it is GW's position that your client never fully repaid GW *for losses the University suffered as a result of the illegal acts of Paul Bedewi and/or his spouse*. At a minimum, Mr. Bedewi still owes GW $18,738 *for direct losses it incurred due to Mr. Bedewi's misuse of his GW issued P-Card,* improper charging of his golf club membership fees to GW accounts and fraudulent stipend payments made to his wife. (Emphasis supplied).

    In response to your expressly defining Mr. Bedewi's obligation as reimbursing GW "for losses incurred as a result of the illegal acts of Paul Bedewi and /or his spouse," (which you alternatively formulate as "direct losses due to his misuse of his GW-issued P-Card"), I provided you with examples (taken from the VIS) of items that were not the product of "illegal acts"/"misuse of his GW-issued P-Card" and, therefore, did not result in "losses" ("direct" or otherwise) to GW. My two submissions to the Court on this subject (first through my letter to the Probation Office and subsequently in my sentencing memorandum) are substantially more precise in responding to the particulars of the VIS. For example, I submitted as an exhibit to the latter document a GW form reimbursement request from Mr. Bedewi and approved by Dr. Azim Eskandarian – who remains a member of your faculty. Among the items Dr. Eskandarian approved is reimbursement for several "local meals". Yet, the VIS asserts that such meals are not subject to reimbursement under GW policy. Whatever GW's auditors might think of this practice, such approvals preclude characterization of these expenditures as criminal conduct.

    4. I am not sure I understand the purpose of the first full paragraph on page two of your current letter. I should first point out that you are misinformed in your belief that Mr. Bedewi's payment of $80,000 "was conveyed to [GW] at the time as merely 'the best that he could do' not as full repayment of this debts to GW." Neither Mr. Bedewi nor I ever stated or implied to GW, its outside counsel, or its outside auditors that the $80,000 he tendered in August 2004 was *necessarily* a partial repayment, *i.e.*, implicitly acknowledging (if I understand your assertion) that he owed more but that he could not pay it at that point. That is not the case.

    Mr. Bedewi and I arrived at $80,000 after reviewing each and every credit card statement and supporting document that Mr. Bedewi had in his possession in August 2004 (which, I believe, was all

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 4

of them). He and I completed that review in two days (thus my disbelief that it took Beers & Cutler two years to complete the same task). *At the time we tendered the $80,000, we believed that it would reimburse GW for all expenditures it had made as a result of Mr. Bedewi's illegal use of the P-Card and for his wife's stipend.* Notwithstanding this expressed belief, Mr. Bedewi agreed that if GW's own review disclosed additional expenditures as a result of his illegal conduct, it could bring those expenditures to our attention, we would consider them, and, if appropriate, reimburse GW for them. It is now clear to me why GW never acted upon this offer.

    5. I also can't figure out the point of your statement that GW has "sole discretion" how it allocates the $80,000 it received from Mr. Bedewi. If you mean that you could falsely assert that you accepted his payment in the belief that he was reimbursing you for his telephone service and a computer that GW got to keep, I guess you could, despite the fundamental dishonesty that such an assertion would entail. But assuming that would not prove an impediment, the absence of any record that your auditors or lawyers were focused on, let alone raised with me in August 2004, reimbursement of such expenses might prove a problem. This would also be true of notes reflecting that the golf club membership, the stipend, and *fraudulent* use of the P-Card were the exclusive topics of conversation at the time that Mr. Bedewi made his payment. Your July 13, 2006, letter, which implicitly acknowledges the source of Paul Bedewi's obligations; and GW's conversations with federal criminal investigators regarding his payment would also tend to belie the revised history you seem to contemplate creating.

    But if you mean that you could apply Mr. Bedewi's $80,000 payment to cover items in the VIS that are not properly recoverable under the Mandatory Victim Restitution Act, you are incorrect. You claim that I disavowed a link between the $80,000 payment and Mr. Bedewi's acknowledged criminal conduct; that is incorrect. In light of your outside counsel's expressed intention to report the results of GW's internal investigation to the USAO (an event I would have assumed even if she had not said so), there was never any doubt that the repayment prior to the government's initiating a criminal investigation would be used to cover all or some portion of the improper expenditures that would constitute the predicate for criminal charges and part of the basis for his sentencing.

    Thus, the link between Mr. Bedewi's criminal conduct and his payment to GW has never been the subject of dispute or debate. GW is limited to recovery in these proceedings to losses that were incurred as a result of Mr. Bedewi's criminal conduct. He paid $80,000 in August 2004 toward covering such losses. There has now been a determination by the federal authorities that the actual pecuniary loss GW incurred from Mr. Bedewi's criminal conduct is $78,602.23. Recovery for so-called "losses" not tied to his criminal conduct has to be pursued elsewhere.

    6. Your statement in the second full paragraph on page two implies that, on its own, the USAO constructed a list of potentially reimbursable items and that GW was asked to "verify" that what the USAO put in the list was properly included. But absent GW providing the particulars of Mr. Bedewi's illegal expenditures, the USAO was incapable of constructing such a list. The government has confirmed this. Other than Mr. Bedewi, GW was the only entity with records showing the universe of Mr. Bedewi's expenditures. Inasmuch as the government was not consulting Mr. Bedewi on the formulation of its original list of potentially reimbursable expenditures, there was simply no source of such information other than GW. Moreover, I have no doubt that GW had completed its review of Mr. Bedewi's expenditures by March 2005. Simply put, GW never had to "verify" or "certify" because it was the creator of the original list.

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 5

I am also confident that GW was consulted with respect to those items that Mr. Bedewi sought to have removed from the list. Had GW objected, there is no question that further discussion would have taken place regarding the government's acceptance of Mr. Bedewi's explanation before finalizing the list of items covered by Mr. Bedewi's $80,000 payment. I have already expressed my view as to why GW waited until the eve of sentencing to raise these expenditures and the MVFRI matter. Suffice to say that nothing in your response causes me to alter that opinion.

7. As for Mr. Bedewi's involvement with the MVFRI, your new, equally inaccurate assertions on that score belie GW's claim that the accusation in the VIS – which you now admit was false – was "inadvertent". You have now compounded GW's initial misrepresentation to the United States District Court by your current misrepresentation that Mr. Bedewi was the "principal investigator and supervisor at GW" for a grant that GW did receive from MVFRI. Based upon this demonstrably false statement – which you would have known was false had you spent even an instant checking GW's records – you self-righteously and maliciously fabricate and then promulgate in a judicial proceeding this concocted notion about Mr. Bedewi's "soliciting grants and performing services through GW for MVFRI while at the same time soliciting separate (and much more lucrative) work and personal payments from the same entity on the outside."

The "principal investigator and supervisor at GW" for the single MVFRI grant GW received was Dr. Azim Eskandarian, who remains on your faculty, not Mr. Bedewi. He, not Mr. Bedewi, was the person tasked with obtaining grants from MVFRI. Indeed, the $340,000 grant that GW from MVFRI was more money than MVFRI gave to any other grantee.

You are also incorrect in your assertion that Mr. Bedewi performed substantial services on the GW grant from MVFRI ("soliciting grants from and performing services through GW for MVFRI"). You surely know (or would, if you checked GW's records) that the vast majority of the work Mr. Bedewi performed was in connection with a research grant sponsored by the Ford Motor Co. (for which, according to Dr. Kennerly Digges, a highly esteemed faculty member then and now, Mr. Bedewi kept "all projects on track to overdeliver results beyond our sponsors' expectations"); and a grant from the Santos Family Foundation, not MVFRI or the Cooperative Agreement with the federal government (as suggested in the VIS).

Finally, Mr. Bedewi's consultancy with MVFRI – the one GW falsely stated was funded by a GW grant – was signed by MVFRI in February 2002 and by Mr. Bedewi on April 1, 2002, which was its effective date. Mr. Bedewi's appointment to his GW position is memorialized in an August 2002 letter which states that the appointment was retroactive to May 2002. Thus, your attempt to conjure an image of Mr. Bedewi lining his own pockets with "separate (and much more lucrative) work and personal payments from [MVFRI] on the outside" rather than working as a "loyal full-time committed professional for [his employer] GW " is, I suggest, confounded by the calendar. Given that this agreement was in place before Mr. Bedewi was an employee, I am unclear precisely what duty he had to GW at the time he and MVFRI negotiated their agreement. In addition, my recollection is that in 2002, GW had no policy against incoming staff retaining their outside consultancies. And considering that the president of MVFRI was the aforementioned Dr. Digges, I feel reasonably confident that GW was aware of Mr. Bedewi's contract.

In your letter, you share your personal view that Mr. Bedewi's relationship with MVFRI, as (inaccurately) described in your letter, is "further evidence" of his "greed and self dealing". Now that it is clear that you have based this opinion on entirely false premises, what inferences would you have the Court draw from Paul Bedewi's role in the interaction of GW and MVFRI? What

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 6

inferences should be drawn about an institution that tries to overcome its first false allegation by engaging in character assassination through a second set of false allegations? Finally, if the conduct to which Paul Bedewi pleaded guilty permits GW's characterization of him as a greedy person, how should one characterize GW when it uses serial deceptive statements and engages in tactics bordering on extortion to further its assiduous pursuit of money in which it has neither a cognizable interest nor a legitimate claim? Frankly, as I read your vitriolic attack on Mr. Bedewi and reflect on GW's deciding to raise the MVFRI issue on the eve of his previous sentencing date in August – while simultaneously offering to "settle" its nonexistent claim for one-half the amount he lawfully earned from his services to MVFRI – my mind becomes transfixed by the image of pots and kettles.

8. Finally, you seem to suggest there is some inconsistency between my so-called "rhetorical indignation" at GW's accusations and my declining to share with you records pertaining to Paul Bedewi's work for MVFRI. I take it you are suggesting that if my indignation was genuine, I would show you the documents you demand to prove to you that your accusations are incorrect. The fundamental problem with applying your analysis to this case is that it assumes two unstated conditions: first, that Mr. Bedewi has some obligation to prove the propriety of the conduct captured in the records; and second, that you are proceeding in good faith with respect to GW's purpose in seeking them. Neither of these conditions is present in our situation.

First of all, Mr. Bedewi has no obligation to prove to GW the propriety of his professional relationship with MVFRI. GW's conduct in dealing with the MVFRI issue demonstrates why the law never places the burden on someone who has been unjustifiably accused to negate an allegation. Based upon nothing but its self-serving opinion regarding Mr. Bedewi's work-capacity, GW has accused him of inflicting financial harm that dwarfs the P-Card/stipend damage; and, of even greater significance, alleged that his conduct toward GW was fundamentally corrupt. In its effort to bolster its opinion, GW has twice made incorrect assertions about the interrelationship of Mr. Bedewi, MVFRI, and GW. Of particular significance with respect to assessing GW's motivation, when we refuted GW's first allegation – that Mr. Bedewi's MVFRI compensation came through a GW grant – GW showed no inclination to re-assess the validity of its allegation that it was somehow harmed by Mr. Bedewi's work for MVFRI. Instead, GW made a second equally inaccurate set of allegations concerning Mr. Bedewi's supposed role in the grant GW received from MVFRI and the relationship of that supposed role to his work under his pre-existing consultancy contract.

Even more troubling, the refutation of GW's claims lies in GW's own records. Either GW has failed to diligently discover the underlying facts before making these statements or it has chosen to ignore what it has found. In either event, GW's claim that it has been harmed by Mr. Bedewi's work for MVFRI remains nothing more than a factually unsupported manifestation of the opinion it has formed of Mr. Bedewi based upon the entirely separate conduct that he has admitted and tried to rectify. Mr. Bedewi declines GW's invitation to assume the burden of changing that opinion.

Furthermore, one of the lessons experience has taught is that when an entity shows the degree of tenacity and vehemence that GW has exhibited in asserting its position despite the absence of factual support, trying to change its mind by the continued presentation of additional facts is a fool's errand. More precisely, GW has already reached, and expressed at every opportunity, its conclusion about Mr. Bedewi's conduct with respect to the MVFRI/GW relationship and the unidentified harm it claims he has inflicted – even though the documents already in GW's possession do not support its view. There is absolutely no reason to believe that GW has any intention of altering its self-serving opinions based upon its examination of Mr. Bedewi's work-product for MVFRI. Thus, I see no

TIGHE PATTON ARMSTRONG TEASDALE, PLLC

William F. Howard, Esq.
December 4, 2006
Page 7

benefit to be derived from facilitating that exercise. MVFRI, the entity for which Mr. Bedewi performed the work, has never complained about its quantity, quality, or the money it paid him to do it. As an outsider to the contract, GW's assessment is irrelevant.

As I said earlier, if GW believes that it can support its claims that Mr. Bedewi was engaged in self-dealing and that it "was additionally victimized by [the] arrangement [between him and the MVFRI], and that Mr. Bedewi was improperly enriched by [that arrangement]," GW is of course free to pursue them. Based upon the record as we see it, Mr. Bedewi would thereafter be free to pursue a claim of malicious prosecution. I would prefer to avoid such a course. I clearly recall that back in August 2004 during a meeting at Beers & Cutler, GW's representative expressed the desire to see that Mr. Bedewi would "never work again" and indifference as to the consequences on his children of such an outcome. I hope that these statements do not express GW's current position. Rather, I hope that GW, instead of continuing on the path it seems to have chosen, will accept that Mr. Bedewi deeply regrets the conduct that he has acknowledged and that now serves as the basis for his status as a felon; that he has done all that he can to make amends to GW; that he has suffered and will continue to suffer the consequences of his actions through the loss of his profession and the hardship he has brought on his wife and children; and that it is ultimately in everyone's interest to move on.

Sincerely,

Steven C. Tabackman

Cc: AUSA John Griffith
    USPO Monica Johnson